**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WORLD CARPETS OF NEW YORK, INC., Respondent.**

**No. 99, Docket 32233.**

United States Court of Appeals Second Circuit.

Argued Oct. 8, 1968.

Decided Nov. 8, 1968.

Richard S. Rodin and David C. Nevins, Arnold Ordman, Gen. Counsel; Dominick L. Manoli, Associate Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., for petitioner.

Bertrand B. Pogrebin, Mineola, N. Y., Rains, Pogrebin & Scher, Mineola, N. Y., for respondent.

Before FRIENDLY, ANDERSON and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order requiring World Carpets of New York, Inc. to cease and desist from violation of §§ 8(a) (1) and (5) of the National Labor Relations Act and to bargain with a union holding authorization cards signed by four of a unit of five employees at its warehouse in Garden City, N. Y. The events giving rise to the order occurred in May, 1966. Although the Board rendered its decision on March 27, 1967, 163 N.L.R.B. No. 74, it waited more than a year before seeking enforcement and did not file its brief until July 31, 1968; in consequence the proceeding did not appear upon our calendar until October. Such unexplained delay is inimical to the proper administration of the National Labor Relations Act; indeed, in the case of a bargaining order, particularly for a unit as small as this, such belated enforcement may require recognition of a union that is almost a stranger to the employees it seeks to represent.

The facts, developed at a two-day hearing, are quite simple: Respondent dis-

tributes carpets manufactured in Dalton, Georgia, by its affiliate, World Carpets, Inc. One Shaheen owns a controlling interest in and is president of both companies as well as of distributors in other parts of the country. Charles Alvin was manager of respondent's warehouse at Garden City. Early in the morning of May 2, 1966, two representatives of Allied Trades Union, Local No. 18, Barresi and Palliata, came to his office. Barresi said that a majority of the men in the warehouse had signed authorization cards and that he was there to get a statement recognizing the union as collective bargaining agent. Alvin replied he had no authority to do this and would have to contact the officials of the parent company. He asked Barresi if he could see the cards. Barresi "just shuffled a group of cards" and said that if Alvin wanted to see them, "it would have to be at the National Labor Relations Board." Alvin then "asked permission" to contact Talley, national warehouse manager at Atlanta. Barresi responded that if Alvin didn't recognize the union, he would pull the men off the job. On Alvin's making a further request for time to talk to Talley, Barresi called Fecter, the president of the Union, who asked to speak directly to Alvin. When Alvin brought up his lack of authority and consequent need to talk to his principals in Georgia, Fecter responded "When you do talk to your officials in Dalton, Georgia, let them know that we are threatening you with pulling out the men."

Alvin immediately called the head office in Georgia but found that Talley was in Los Angeles. Located there, Talley told Alvin not to sign anything and to endeavor to get a little time to enable them to make a report to the president and to think things over. After being put on the phone with Barresi, Talley again requested Alvin to try to get more time, said there was nothing he could do until he talked to the president, and promised to call back. Feeling uncomfortable under Barresi's pressure, Alvin went out of his office and called Talley again. Talley said "that he cannot give me a decision and try to ask for more time so we can submit a report to the parent organization in Dalton, Georgia, as he knew that Shaheen did not want a union in the warehouse." On his return to the conference room, apparently believing that any further requests for time would be fruitless, Alvin told Barresi "that he had just spoken to Talley, and Talley had told him that the office in Georgia had said that the Company did not recognize any union, to let them strike." [1]

The Union carried out its threat almost immediately. Three employees left their work and began picketing. A fourth, the only one who had not signed a card, stayed on the job when Alvin told him he was not required to leave. The fifth, who was not at work on May 2, observed the picket line on his way to work the next morning and started picketing. Alvin admitted seeing the four pickets. On May 5, the Union filed a charge of violation of § 8(a) (5). Sometime during the next two weeks Talley told Alvin that among the reasons Shaheen didn't want a union in New York was his fear that this would spread to other warehouses.

About two weeks after the strike, when two of the four strikers had taken other employment, Pollock, a foreman at the warehouse, offered increased wages to the remaining two if they would return to work, and said that if the Union got in, the Company might close the warehouse. Respondent claimed that Pollock was doing this on his own and offered in evidence a May 19 letter from its counsel, which had been shown the two men, indicating that they would be protected from any threats or violence by the Union if they returned but that "the Company may not make any inducement, such as increased pay or better working conditions, to employees out on strike to secure their return to work."

---

1. This was Barresi's version, which Alvin did not deny. While the Board was warranted in crediting this, it apparently was not a correct statement of what Talley had said.

The Examiner excluded this—erroneously in our view—found "that Pollock apparently spoke for the Company,"[2] and concluded that this violated § 8(a) (1).

Respondent made an extended offer to prove that from the outset the picketing, in which union representatives had joined, "was marked by violence, acts of coercion, interference, either directed at employees or at people visiting but in the presence of the pickets themselves so that they could reasonably assume that this would be the conduct that they would suffer had they not stayed out." The offer included evidence that force was used on trucks entering the premises; that a union delegate threatened "to take care of" Alvin; that the car of an assistant foreman was damaged; that the union president threatened to kick Alvin's front teeth out and chased his car at speeds up to 80 miles an hour; and that two pickets threatened Alvin and another employee with violence when they went outside the warehouse to help unload a truck making deliveries. The Examiner rejected any evidence of violence unless the acts were such as might have frightened the fourth employee into joining the picket line.

■■ Respondent asks us to deny enforcement because of alleged failure of the General Counsel to negate the existence of good faith doubt of the Union's majority status. See NLRB v. River Togs, Inc., 382 F.2d 198, 206–08 (2 Cir. 1967). It says that an employer is not bound to take a union's word that it has authorizations signed by a majority, which is surely true, and that here the Union refused access to the cards. It construes Barresi's remark that the cards could be seen only at the National Labor Relations Board as meaning that they could be seen only when presented as evidence on a charge of refusing to bargain. While that is an arguable interpretation, particularly since it is hard to perceive what would be gained by showing the cards at one place rather than another as distinguished from submitting them to third-party check, it is not the only permissible one and we cannot fault the Board for reading the statement to mean that the cards would be made available at its office within a reasonable time. Still, until the cards were displayed, the employer could have a reasonable doubt of the existence of a majority in the absence of other evidence, and the exchanges among Alvin, Talley and Barresi are too equivocal to support a finding that the employer had made a final determination not to recognize the Union whatever the facts as to signatures might turn out to be. Subordinate officials confronted with demands for recognition are not required to act on the spur of the moment without adequate opportunity for consulting top management, labor relations advisers and counsel, see Sprouse-Reitz Co., Inc., 168 N.L.R.B. No. 56 (1967), or to speak with the precision of a corporate indenture to importunate union organizers.

■ Cn the other hand there is force in the Board's alternative contention that any reasonable doubt respondent might have had was dissipated by the strike and the picketing, first by three and then by four of the employees in the five man unit.[3] While, as stated by then

---

2. This could mean either that Pollock appeared to the employees to be speaking for the company, or that the Examiner believed he was so speaking. Although on the latter view there is basis for the conclusion of a violation of § 8(a) (1), these acts of a minor supervisor "are hardly serious enough to support a finding that Respondent had earlier refused to bargain with the Union on request in order to gain time to undermine the Union by unlawful means." Clermont's Inc., 154 N.L.R.B. 1397, 1401 (1965).

3. Respondent contended, on not implausible grounds, that the unit should have included a sixth employee. Accepting that a pardonable mistake as to the membership of the appropriate unit may give rise to a doubt as to a majority status, see Clermont's Inc., 154 N.L.R.B., at 1401-02, the basis for doubt would have disappeared when the fourth employee joined the picket line—unless there was reason to suspect coercion.

Trial Examiner Ordman in Norlee Togs, 129 N.L.R.B. 14, 19 (1960), "The fact that a majority of employees do not report to work during a strike does not of itself establish majority status," see also B & W Engineering and Manufacturing Co., 172 N.L.R.B. No. 183 (1968), actual participation in a picket line is quite different. See Scobell Chemical Co. v. NLRB, 267 F.2d 922, 925–926 (2 Cir. 1959). The employer argues that it might nevertheless still have entertained a reasonable doubt based on a belief that the pickets were coerced. The present record does not support this view and the further proof offered hardly went far enough in that direction to lead us to deny enforcement if that were the only argument it supported.

■ However, the evidence was also offered as proving other conduct disqualifying the Union from relief. The Examiner rejected the offer on that score upon the basis that the union misconduct respondent proposed to show "would not have been of such gravity as to warrant withholding of a remedial order," citing United Mineral & Chemical Corp., 155 N.L.R.B. 1390 (1965). But we subsequently reversed that ruling in NLRB v. United Mineral & Chemical Corp., 391 F.2d 829, 838–841 (2 Cir. 1968). Although the violence here does not seem to have been so extreme as in United Mineral, the employer was entitled to develop the facts and have the Board apply the criteria outlined in our decision there. Of course, if the evidence should indicate that the respondent could reasonably have believed that the pickets did not represent an uncoerced majority, that finding alone would require denial of relief.

■ On the other hand, if, on the remand we are directing, the Board should find the facts in a sense favorable to the General Counsel, it should not proceed immediately to the issuance of a bargaining order but should consider whether such an order in this case will further the policies of the National Labor Relations Act, notably "to provide orderly and peaceful procedures for prevent-

ing the interference" by employees and employers "with the legitimate rights of the other." § 1(b). Cf. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 193–197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). As said in NLRB v. Flomatic Corp., 347 F.2d 74, 78 (2 Cir. 1965), a bargaining order is "strong medicine," whose "potentially adverse effect on the employees' § 7 rights must not be overlooked." While, despite the contrary ruling of another circuit, NLRB v. S. S. Logan Packing Co., 386 F.2d 562 (4 Cir. 1967), we continue to hold that a union validly authorized by a majority of the employees in an appropriate unit is generally entitled to recognition without having to submit to a Board-supervised election, the Board should not automatically issue a bargaining order in every such case without considering whether the policies of the Act will be effectuated thereby. "The Act does not create rights for individuals," or for unions, "which must be vindicated according to a rigid scheme of remedies. It entrusts to an expert agency the maintenance and promotion of industrial peace." Phelps Dodge Corp. v. NLRB, supra, 313 U.S. at 194, 61 S.Ct. at 852. We have difficulty in perceiving how industrial peace is furthered by encouraging a union to press recognition demands with such urgency and disregard of an employer's need for investigation and consultation as almost to insure a strike. The Board should also consider the wisdom of a bargaining order which in this case cannot be enforced until three years after the event, see Bryant Chucking Grinder Co. v. NLRB, 389 F.2d 565, 575 (2 Cir. 1967) (dissenting opinion of Judge Anderson), cert. denied, 392 U.S. 908, 88 S.Ct. 2055, 20 L.Ed.2d 1366 (1968), since the "potentially adverse effects" of such an order on § 7 rights increase in direct ratio to the lapse of time. The one action by the employer that is even contended to have violated § 8(a) (1), Pollock's promises and threats, see fn. 2, has surely spent its force.

The order is vacated and the cause remanded for further proceedings consistent with this opinion.