**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WORLD CARPETS OF NEW YORK, INC., Respondent.**

**No. 647, Docket 71–2033.**

United States Court of Appeals, Second Circuit.

Argued May 9, 1972.

Decided June 7, 1972.

Douglas S. McDowell, Atty., N. L. R. B. (Peter G. Nash, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Allison W. Brown, Jr., Atty., Washington, D. C., of counsel), for petitioner.

Bertrand B. Pogrebin, Mineola, N. Y. (Rains, Pogrebin & Scher, Mineola, N. Y., of counsel), for respondent.

Before FRIENDLY, Chief Judge, and MOORE and ANDERSON, Circuit Judges.

FRIENDLY, Chief Judge:

This proceeding, dealing with alleged unfair labor practices with respect to a five man unit in 1966, is back again.[1] In our previous opinion, 403 F.2d 408 (2 Cir. 1968), familiarity with which is assumed, we remanded for consideration whether the union with which World Carpets was directed to bargain had engaged in such misconduct as to disqualify it from being granted that relief under our decision in NLRB v. United Mineral & Chemical Corp., 391 F.2d 829, 838–841 (2 Cir. 1968), and, even if not, whether a bargaining order in this case would further the policies of the National Labor Relations Act. In the two and a quarter years between our remand and the Board's second decision, 188 N.L.R. B. No. 10 (Jan. 26, 1971), the criteria governing determination of the latter question—indeed, of the whole issue of respondent's refusal to bargain—were significantly altered by the Supreme Court's opinion in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and the three other cases decided therewith.

A further hearing was held before Trial Examiner Ladwig in the late summer of 1969. His principal findings with respect to union misconduct are set forth in the margin.[2] The Examiner added:

The General Counsel's witnesses, who denied most of the testimony on

1. The alleged violations at issue here occurred in May, 1966. The Board rendered its first decision in March, 1967, but did not seek enforcement for over twelve months. We remanded in November, 1968. The Board rendered its second decision in January, 1971. This time, the Board waited ten months to seek enforcement. Thus, more than six years have elapsed since the violations at issue here. We are now advised that only one of the persons in the unit in 1966 is still working for the respondent.

2. The picketing began on the afternoon of May 2, 1966, and lasted about 3 weeks.

It was led by Union Representative George Paliotta, who was present each day except when he was arrested one afternoon on a charge of "physical violence" and held overnight in jail before being released on bond. (The criminal charge was later dismissed when the complaining witness, a strike replacement, refused to testify.)

Credited testimony shows that soon after the picketing began, Paliotta and striking employees engaged in a campaign of threats and intimidation to force the cessation of business at the carpet warehouse.

which the above findings are based, did not impress me favorably. On the
other hand, the Company's witnesses appeared to be endeavoring to give

On the first afternoon, May 2, Paliotta shouted into the warehouse that they had "better wise up in there because no business is going to go on here." As Assistant Foreman Wendell W. Dow was returning from lunch, Paliotta warned him that "if I didn't join the picket line, I'd be kicked out of my job," and "We'll get you tonight. We'll take care of you one way or the other." About three or four times, Paliotta warned Sales Supervisor Harold Traister (who worked at the warehouse during the strike) that he could get hurt. On one occasion, Paliotta asked him if he had a family, and when Traister did not answer, Paliotta said, "Well, we have ways of finding out," and warned that his family also could get hurt, "that things have a way of happening." [sic.] On another occasion, when Union President Jack Fecter was present, Paliotta warned (in Traister's words), "If I have a family, my family can get hurt, we have ways of finding out where you live. That I should stay out of World Carpet until this thing was over."

One evening in the first week of the strike, Union President Fecter chased Warehouse Manager Charles P. Alvin's car, going as fast as 80 miles an hour at times. As Alvin was leaving work, the union president had told him, "I'm Fecter. I'm going to knock your teeth out." About the second day of the strike, one of the union representatives raised his fist at Alvin and warned, "Alvin, we are going to take care of you."

On two occasions, Union Representative Paliotta and another picket followed Dow's car at high speeds as Dow was leaving work. The first time, Dow was transporting a nonstriker and a strike replacement to their homes. While the two unit employees were in the car, Paliotta "tried to force us off the highway." Dow credibly testified how he took evasive actions, "zig-zagging" from one street to another until he was finally successful in outrunning Paliotta.

Both the nonstriker, Robert Edrington, and strike replacement Arthur Berbino were personally subjected to intimidation at the warehouse. On the second day of the strike, Edrington went outside to bring in a delivery of twine. Two of the pickets (in the presence of Union President Fecter and Union Representative Joseph Barresi) took baseball bats from a car, stood over Edrington with the bats raised in a menacing manner, and threatened to do something to him with them.

He went back inside the warehouse, without the twine. (Later that week Edrington stayed away from work after telling Dow, who had been taking him to and from work, that he and his family were afraid. When Edrington was called as a witness, he appeared to be quite nervous, and unable to recall but very little of what had happened.) Gerbino, one of the three strike replacements, was the employee who filed the "physical violence" charge against Union Representative Paliotta. The incident occurred several days after the strike began. As Gerbino was returning from lunch, Paliotta walked up, called Gerbino a scab, and started pushing him against the warehouse wall, while stating, "I'll take care of you." Assistant Foreman Dow and an office employee came to Gerbino's rescue, and Paliotta released him.

In order to prevent trucks from entering the warehouse during the strike, Union Representative Paliotta and other pickets repeatedly blocked the entrances, standing in the way of the trucks, and moving only if the truck forced their way through. One driver left when Paliotta opened the truck door as the driver was backing into the warehouse, grasped the driver's arm or shoulder, and told him, "You can't go in there. This place is on strike." The driver was too frightened to make the pickup. A day or two later, when another driver from the same company (a retail carpeting chain) returned for a pickup, Paliotta told the driver, "If you come in that warehouse, we'll fix you and your truck." This driver also left. Still later, the customer's assistant manager returned in an unmarked truck. As he got out of the truck to go inside the warehouse, Paliotta jumped in front of him, tried (unsuccessfully) to shove him away from the door, and threatened to "take care of him" and to "take care of that truck." On another occasion, when the Company rented a truck and had it driven to the warehouse, pickets attempted to block the entrance. Two of the pickets were holding sticks and one was holding a baseball bat. The police were repeatedly called.

About 3 or 4 days after the strike began, Assistant Foreman Dow found that his car, parked outside the warehouse, had been damaged. There was a dent in one of the doors, a scratch the entire length of the car, and two flat tires (punctured by a sharp object, like an ice pick). Paliotta had threatened to "get" Dow's car.

factual accounts of what had occurred (over 3 years earlier).

He concluded that "the violence which did occur was obviously the result of a campaign, planned by the union officials, to force the cessation of the business by threats and intimidation," rejected the General Counsel's contention that the evidence showed mere "sporadic picket line flashes over a two week period," and held the union's misconduct to have been so much graver than the company's as to disqualify the union from relief for the latter's refusal to bargain. Turning to *Gissel*, he concluded that the relatively minor misconduct alleged on the part of a company foreman would not preclude a fair election. He therefore recommended an order which would require the company to cease and desist from actions such as those of the foreman but did not include a bargaining requirement.

The Board, with Chairman Miller dissenting, disagreed with the Trial Examiner. The majority questioned his finding that the picketing employees were carrying baseball bats, pointing out that one witness had said only that the instruments "looked like a bat" but "wasn't sure" and another had characterized them as long mop sticks and a small baseball bat. From this it concluded that "what the pickets carried were the type of wooden sticks to which strike posters were attached"—although no witness had expressly said so. Anyway, the instruments, whatever they were, had been used only to threaten a non-striking employee and not to hit him. The majority continued by saying that "[w]hile we do not discredit the fact that the warehouse manager, Charles P. Alvin, was chased in his car, we cannot accept the fact that speeds up to 80 miles an hour were attained at times through city streets"—as if it would matter if the speed were only 60 miles an hour. It refused to "fully accept" the Trial Examiner's crediting of witness Dow's description of what had happened when he was chased by a union official and a picket, because another employee who was in the car had not gone into similar detail, although he had not been asked to do so. For these and other reasons, the majority thought the union misconduct less serious than did the Examiner.

If decision turned on the point, we would have serious question whether the Board's findings as to the lesser degree of the union's misconduct could survive scrutiny under the principles laid down in Universal Camera Corp. v. NLRB, 340 U.S. 474, 492–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and FCC v. Allentown Broadcasting Corp., 349 U.S. 358, 364, 75 S.Ct. 855, 99 L.Ed. 1147 (1955), see 2 Davis, Administrative Law Treatise § 10.04 at 26 (1958), and *id.* at 411–412 (Supp.1970), concerning the regard required to be given an examiner's findings on credibility. However, even accepting the Board's version of the facts, the decision to issue a bargaining order failed to take adequate account of *Gissel*.

According to the Court's opinion, 395 U.S. at 594, 89 S.Ct. at 1930, the Board represented on oral argument of *Gissel* that it had "virtually abandoned" the approach of issuing a bargaining order simply on the basis of an employer's lack of good faith doubt as to a union's majority and that "the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election. Thus, an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct. . . ."[3]

---

3. The Board's stated exceptions to that position were that (1) the employer could not refuse to bargain if he *knew*, through independent evidence, that the union had majority support, and (2) the employer could not base an initial refusal to recognize on the appropriateness of the unit, and claim later that he doubted union strength. 395 U.S. at 594, 89 S.Ct. 1918. Neither exception would seem to be presently operative. See note 4, *infra*.

The Court adopted the position that employer misconduct which has "the tendency to undermine majority strength and impede the election processes" would justify a bargaining order. 395 U.S. at 614, 89 S.Ct. at 1940.

The majority's supplemental decision does not comply with *Gissel*. To begin, the decision is in plain error when it characterizes our previous opinion as holding that a union majority had been demonstrated "at the time of the Union's demand for recognition;" our holding was just the opposite, 403 F.2d at 411.[4] This error undermined the majority's basic conclusion that "Respondent's unlawful conduct in derogation of its employees' Section 7 rights was clearly a contributing cause of the strike" and that ordinary strike-connected violence should therefore not be held against the union. The employer had not derogated from any of the employees' § 7 rights when the union called a strike only a few hours after its unexpected demand on a warehouse manager for recognition, without even displaying the authorization cards.

Proceeding from this erroneous foundation, the Board found serious employer misconduct vitiating the possibility of a fair election in the remark of warehouse foreman Pollack, more than two weeks after the strike had begun, mentioned in our previous opinion, 403 F.2d at 410–411. The majority greatly exaggerated the effect of this statement. By the time of the employer misconduct, only two of the four strikers, Granado and Reid, were still picketing, the two other strikers having taken other employment. Pollack asked Alvin, the plant manager, whether the two men could be rehired. Alvin called the company attorney, who said this would be all right if they were rehired at their former salary. Pollack met them and explained the terms on which they would be rehired, but added that "after everything was settled I would try to get them more money," to wit, "the same as anyone else [other warehouse employees] was making." When Granado expressed fear about what might befall him and his family from the union if he returned to work, Pollack said he would attempt to get some document that would protect the returning workers. He procured a letter from counsel stating that the employees could feel free, in the event of threatened violence, to call an NLRB examiner, whose telephone number counsel furnished, and that the Racket Bureau of the District Attorney's office had warned the union officials against violence. The letter added that "the Company may not make any inducement, such as increased pay or better working conditions, to employees out on strike to secure their return to work." Pollack gave a copy of this to Granado and Reid. Counsel's authoritative letter effectively negated any tentative "offer" of higher wages made by this

4. The Board adds that the majority was demonstrated immediately thereafter by the fact that four of the five employees joined the picket line. This is factually true, but, in light of *Gissel* and later developments, we are no longer certain that it is legally significant. As indicated in note 3 *supra*, the Board took the position in arguing *Gissel* "that an employer could not refuse to bargain if he *knew*, through a personnel poll for instance, that a majority of his employees supported the union." 395 U.S. at 594, 89 S.Ct. at 1930. (emphasis in original) While this was certainly pre-*Gissel* law if one added the qualification that the support had been fairly obtained, as we recognized in our previous opinion, 403 F.2d at 411– 412, the Court seems not to have decided whether this would remain true after *Gissel's* emphasis that serious unfair labor practices undermining the possibility of a fair election constituted the primary, and possibly the sole, justification for avoiding a Board-conducted election. In Linden Lumber Division, Sumner & Co., 190 N.L.R.B. No. 116 (June 7, 1971), the Board held in a 3–2 decision that it was not an unfair labor practice for an employer to refuse to bargain on the basis that the only evidence of a union majority he would accept was the result of a Board election. Under this view the strike here was not an unfair labor practice strike at all.

minor supervisor, which he manifestly had no ability to execute.[5]

■ The other remark of Pollack's on which the majority relied was that he "had heard that [President] Shaheen had said he would close the warehouse down and ship directly from Georgia or open a new warehouse up in Jersey before he would let the Union in." The majority sought, quite unsuccessfully, to equate this hearsay scuttlebutt related by a minor supervisor, not shown to have been authorized in any way, with the many communications of the employer's president in Sinclair Co. v. NLRB, detailed in 395 U.S. at 587–589, 89 S.Ct. 1918. We cannot accept the conclusion that this remark, even when coupled with that previously analyzed, would have made a fair election impossible. Although we realize that *Gissel* placed great discretion in the Board to decide when the employer's misconduct so jeopardizes the chances of a free election that a bargaining order must issue, we will not automatically defer to the Board's decision when, as here, the employer's misconduct is minimal and the Board's opinion not only is based on faulty premises but is devoid of any analysis as to why, in this particular case, a fair election was no longer possible.[6] See NLRB v. General Stencils, Inc., 438 F.2d 894, 901–905 (2 Cir. 1971).

■ Furthermore, even if we agreed that the employer's conduct might have prejudiced the chances of a free election, that conduct would have to be weighed against the union's. If the violence had been mainly practiced by the striking employees, it might be contended that, however reprehensible even on the Board's watered-down version, this showed the enthusiasm entertained for the union by a majority and hence would not interfere with a fair election since the votes of the intimidated minority could not affect the result. While we doubt that we would accept that argument, since our concept of an election includes an opportunity for full and free discussion, uninfluenced by fear of unfair tactics by either side, we need not decide that point. Here most the violence was the work of union officials who were not employees, and its effect was to intimidate the latter, as witnessed by Granado's fears over the consequences of a return to work, recited above. The prospect of a fair election had thus vanished for the time being, as a result of the union's activities, prior to the foreman's remarks.

An order will be entered directing enforcement with respect to enjoining further § 8(a) (1) violations, as recommended by the Trial Examiner. The Board's request for enforcement of its bargaining order is denied. No costs.

5. This conclusion is strengthened by Granado's testimony that he did not decide to return until he saw the letter, and that Pollack's unauthorized statements were not sufficient, by themselves, to induce his return.

6. Although *Gissel* clearly mandates a reasoned analysis by the Board as to how the employer's misconduct has jeopardized the chances for a fair election *in each particular case*, concern has been voiced by this court, e. g., NLRB v. General Stencils, Inc., *supra*, 438 F.2d at 901–905, and the commentators, e. g., Perl, The NLRB and Bargaining Orders: Does a New Era Begin with *Gissel*, 15 Vill.L.Rev. 106, 111–113 (1970); Pogrebin, NLRB Bargaining Orders Since Gissel: Wandering from a Landmark, 46 St. John's L. Rev. 193, 201–207 (1971), that the Board's bargaining orders since *Gissel* have been deficient in this respect. We continue to hope that the Board will make a more meaningful attempt to integrate findings of company misconduct with a reasoned analysis of how that misconduct jeopardized the chances for a fair election.