**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SCOLER'S INCORPORATED, Respondent.**

**No. 717, Docket 71-2217.**

United States Court of Appeals, Second Circuit.

Argued June 28, 1972.

Decided Sept. 11, 1972.

Rehearing Denied Oct. 23, 1972.

Charles N. Steele, Atty., N.L.R.B. (Peter G. Nash, Gen. Counsel, NLRB, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael F. Messitte, Atty., NLRB, of counsel), for petitioner.

Emanuel N. Psarakis, Hartford, Conn. (Sorokin, Sorokin, Hurwitz, Wetstone & Psarakis, Hartford, Conn.), for respondent.

Before MOORE, SMITH and TIMBERS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

The National Labor Relations Board pursuant to section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e), petitions for the enforcement of its order of July 17, 1971 (192 NLRB No. 49) against Scoler's Incorporated. The Board, affirming the Trial Examiner, found that respondent had engaged in unfair labor practices affecting commerce in violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by coercively interrogating its employees, threatening reprisals against union supporters and promising favorable treatment to those who opposed union activity, by promising to freely grant higher wages absent union recognition but otherwise to curtail operations, and by creating the impression of surveillance. The Board also held that respondent had violated section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by refusing to bargain with Local 59, Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO, representative of a majority of employees in an appropriate bargaining unit prior to the onset of the above named unfair labor practices; since respondent's misconduct became so pervasive as to make a fair election impossible, the Board ordered respondent to bargain with Local 59 at the union's request. The Board also ordered respondent to cease and desist from the unfair labor practices found and from any like denial of employees' section 7 rights, and to post the usual notices of the proceedings. No jurisdictional issue exists since the claimed unfair labor practices occurred in Hartford, Connecticut where respondent, engaged in commerce within the meaning of the Act, operates a restaurant employing waiters, bartenders, sandwichmen, cooks and a hostess. We find that the Board's findings and order are based on substantial evidence on the record taken as a whole and grant enforcement.

By July 30, 1970, Local 59 in an organizing campaign had obtained 11 signed application cards from what it viewed as a unit of 18 waiters, waitresses and bartenders employed by respondent; the cards clearly and prominently provided that the signer applied for union membership, and as clearly if less prominently authorized the union to represent the signer in collective bargaining. The following day respondent's owner, Clifford Lackman, was informed of the filing of a petition for an election with the Connecticut Labor Board. Shortly thereafter, met with complaints from Local 59's business manager, LaPenta, that he was interfering with his employees' section 7 rights, Lackman followed LaPenta's advice to retain a labor lawyer.

At a joint conference at the state board's office on August 17, respondent contended that sandwichmen and kitchen employees should also be included in the bargaining unit, and a hearing was scheduled for August 24. On August 19, however, Local 59 formally demanded recognition. The demand was rejected by respondent which expressed doubts both as to the validity of the cards and as to the appropriateness of the unit, and Local 59 commenced picketing on August 21; on the same day Local 59 withdrew without prejudice its petition before the state board.

Respondent thereupon on August 25 filed a petition with the National Labor Relations Board seeking an election in a unit of all the restaurant's employees except for statutory exclusions; two days later it amended its petition to suggest that an appropriate unit might also be all waiters, waitresses and bartenders, furnishing a list of 19. The Board's Regional Director expressly found the latter unit to be appropriate and his decision was not appealed. The election was held on September 9, but since the instant litigation had begun on the previous day, the ballots have been impounded.

The principal issues raised on this appeal are (1) whether there is substantial evidence in the record as a whole to support the Board's finding of unfair labor practices violative of section 8(a)(1) of the Act; and (2) whether the Board properly ordered respondent to recognize and bargain with Local 59.

Turning first to the findings of unfair labor practices, at least three of the five indicia of coercive interrogation set out in Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964)[1] plainly appear in Lackman's questioning of his employees; more is not required. See NLRB v. Rubin, 424 F.2d 748, 751 (2d Cir. 1970). Lackman, owner of the restaurant, who could hardly have been higher in the company hierarchy, questioned at least six of his employees in a unit of only 19,[2] specifically seeking information as to the supporters of and organizers for Local 59, and the intended vote of the interviewee. That the employees questioned felt threatened seems clear from their consistently false or evasive responses.

With respect to the other unfair practices charged, we are satisfied with the accuracy of the Trial Examiner's determinations that Lackman told two employees on several occasions that he would look after those who opposed the

[1] (1) The background, i. e., is there a history of employer hostility and discrimination?

(2) The nature of the information sought, e. g., did the interrogator appear to be seeking information on which to base taking action against individual employees?

(3) The identity of the questioner, i. e., how high was he in the company hierarchy?

(4) Place and method of interrogation, e. g., was employee called from work to the boss's office? Was there an atmosphere of "unnatural formality"?

(5) Truthfulness of the reply.

[2] Given repeated questioning in a small unit, it is particularly likely that the "workers [will] quickly get the message of their employer's anti-union attitude." NLRB v. Consolidated Rendering Company, 386 F.2d 699 (2d Cir. 1967).

union, and a large group of employees that they could have had a wage increase without union help simply by asking for it; he also twice implied that he would discharge the union's principal supporters, and on another occasion that he would if necessary close up part of his restaurant. All such promises of benefits and threats of reprisals plainly aimed at discouraging union activity are, of course, violative of section 8(a)(1) of the Act. *See, e. g.,* NLRB v. Flomatic Corporation, 347 F.2d 74, 76 (1965); NLRB v. Consolidated Rendering Company, *supra,* n. 2, 386 F.2d at 703. Lastly, Lackman created an impression of surveillance, *see* NLRB v. Gotham Shoe Manufacturing Company, 359 F.2d 684, 685 (2d Cir. 1966), by naming those he considered to be the union ringleaders and accusing one employee of having lied about her union sympathies.

■■ To cure the foregoing unfair conduct, respondent relied on a letter, leaflet and speech to the employees during the week before the election designed to reassure them that they could vote without jeopardizing their jobs. The Trial Examiner quite properly characterized this belated "lip service" paid to employees' rights as "too little, too late." Respondent is left with the unenviable task of attacking the Trial Examiner's resolutions of credibility, hardly an easy road to reversal. *See, e. g.,* Mak-All Manufacturing, Inc. v. NLRB, 331 F.2d 404, 405 (2d Cir. 1964). In this case, those resolutions were carefully made and we will not disturb them. In sum, we have no doubt, based on the credited testimony, that the Board's findings are sustainable by substantial evidence on the record taken as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); section 10(e) of the Act, 29 U.S.C. § 160(e).

■■ Having sustained the findings of employer violations of section 8(a)(1), however, we must face the more difficult question whether those violations warranted an order to bargain with Local 59, which had once achieved a card count majority,[3] without holding

---

3. Although respondent has abandoned the contention made to the Trial Examiner that a unit of waiters, waitresses and bartenders—the very unit it had suggested in its amended petition for an election—was inappropriate, it continues to deny that Local 59 ever obtained signed authorization cards from a majority of eligible employees in the agreed upon unit. Were this contention upheld, respondent's denial of recognition to Local 59 would not be a violation of section 8(a)(5) of the Act, *see* NLRB v. Gissel Packing Co., 395 U.S. 575, 597, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and other quite substantial unfair labor practices would be required to warrant the issuance of a bargaining order. *See id.* at 613–615, 89 S.Ct. 1918.

The Trial Examiner expressly approved the exclusion of a hostess from the list submitted to the Board's Regional Director, and found it unnecessary to rule on the validity of the authorization card of one Cyr, or on whether the head bartender was a supervisor, since at a minimum Local 59 had 10 cards in a unit of 19; the Board ruled that Cyr's card was valid. We are unpersuaded by respondent's arguments to reduce Local 59's representation to 10 employees in a unit of 20 by throwing out Cyr's card and including both the hostess and head bartender in the unit. The findings below are amply supported by the evidence. Cyr admitted having read that the card, clear and unambiguous on its face, was an application for union membership, and did not contend that the solicitor of the card had expressly told her that the card was other than its language indicated it to be, *see Gissel, supra,* at 606–607, 89 S.Ct. 1918; the Trial Examiner resolved all issues of credibility in favor of counting Cyr's card. Moreover, it is clear that the hostess, who wore no uniform, was paid a salary, assigned the tables to the waitresses, and ran the restaurant in the owner's absence, was not improperly labeled a *supervisor within the* meaning of section 2(11) of the Act, 29 U.S.C. § 152(11). We need not discuss the status of the head bartender. Given that Local 59 in fact at one time represented a majority, respondent's unfair labor practices, disruptive of the election process, constituted a violation of his section 8(a)(5) bargaining obligation.

another election to show that the union has been able to maintain its majority status. Under the teaching of *Gissel, supra* n. 3, at 614–615, 89 S.Ct. at 1940, the Board had to decide whether respondent's conduct was such "that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order" or whether that conduct fell into the "category of minor or less extensive unfair labor practices, which because of their minimal impact on the election machinery, will not sustain a bargaining order." In weighing its answer, the "Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." *Id.* at 614, 89 S.Ct. at 1940.

In reviewing the Board's answer this court must give "special respect" to the Board's ability to select a remedy based on a "fund of knowledge and expertise all its own." *Id.* at 612, n. 32, 89 S.Ct. at 1939. Nevertheless, if our review is to be meaningful, the Board "should explain in each case just what it considers to have precluded a fair election and why, and in what respects the case differs from others where it has reached an opposite conclusion." NLRB v. General Stencils, Inc., 438 F.2d 894, 902 (2d Cir. 1971). Respondent forcefully argues that in this case the Board has failed adequately to explain its decision, has ignored the relevant factors set forth in *Gissel,* and has therefore acted inconsistently with its procedure in subsequent cases in which it provided a full *Gissel* analysis; the argument predictably concludes that were such an analysis made it would demonstrate the impropriety of a bargaining order as a remedy in this case.

The Board of course adopted the decision of the Trial Examiner who discussed respondent's unfair labor practices in explicit detail before reasoning that the "repeated threats to punish union adherents and reward union opponents and the coercive interrogation were sufficiently widespread in this small, closely-knit unit, to make a fair election impossible." 192 NLRB No. 49 at 9 (mimeographed decision). Lackman's election week effort to compensate for past unfair practices was discounted. The opinion then proceeded, as *General Stencils* directs, to distinguish those cases relied on by respondent in which the remedy of a bargaining order had not been imposed. It concluded "that a bargaining order should be entered here as the Company's unfair labor practices may fairly be characterized as pervasive, and at the very least so undermined the Union and impeded the election process as to make a fair election impossible." *Id.*

The Board may therefore be said to have examined, as *Gissel* suggests, the full range of respondent's unfair conduct and its past effect; it has not made any prediction of the likely recurrence of such conduct, but *Gissel* merely suggests, and does not require, consideration of that factor. Indeed the Court noted, in discounting the value of a cease-and-desist order in all circumstances that a "bargaining order is designed as much to remedy past election damage as it is to deter future misconduct." *Gissel,* 395 U.S. at 612, 89 S.Ct. at 1939. In certain cases, as here, the damage already done may be so severe that the probability that employer misconduct will not recur is irrelevant. The Board has listed the combination of practices it deemed fatal—coercive interrogation together with threats of punishment and promises of reward—and why—because the impact was overwhelming in a small closely-knit unit. While we might have preferred a fuller explanation of its decision,[4] we are sat-

4. *See* NLRB v. World Carpets of New York, Inc., 463 F.2d 57, at 62 n. 6. (2d Cir. 1972).

isfied that the Board has considered the relevant factors, and adequately apprised the parties and this court of its reasoning; we will respect the Board's exercise of its discretion in selecting a bargaining order as a remedy for a section 8(a)(5) refusal to bargain in the circumstances of this case. *See e. g.,* Byrne Dairy, Inc. v. NLRB, 431 F.2d 1363 (2d Cir. 1970); NLRB v. L. B. Foster Company, 418 F.2d 1 (9th Cir. 1969), cert. denied, 397 U.S. 990, 90 S. Ct. 1124, 25 L.Ed.2d 398 (1970); NLRB v. Wylie Manufacturing Company, 417 F.2d 192 (10th Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970).

MOORE, Circuit Judge (concurring in part):

While I agree with the majority that Lackman's interrogation of some of the employees of Scoler's was violative of section 8(a)(1), 29 U.S.C. § 158(a)(1) (1970), I cannot agree that a bargaining order is an appropriate remedy on the facts of this case. I would therefore modify the Board's order by deleting the direction to bargain with the union.

I recognize that in fashioning remedies for employer violations of section 8(a)(1) the Board has broad discretion.[1] But, as Chief Judge Friendly said for this court in *General Stencils*: "Bargaining orders are not immune from the great principle that like cases must receive like treatment."[2] I do not believe that the Board applied the "great principle" in this case.

For example, in *Restaurant Associates Industries*,[3] the Board refused to issue a bargaining order even though it agreed with the trial examiner that the employer committed seven independent 8(a)(1) violations, including promises of benefits made to at least nine out of twelve unit employees and an anticipatory refusal to bargain with the union. In refusing to issue a bargaining order the Board emphasized that the employer appeared to be willing to cooperate in and be bound by an election.[4]

In *New Alaska Development Corporation*[5] the Board similarly refused to issue a bargaining order even though the employer had committed 8(a)(1) violations by threatening loss of benefits and elimination of the entire maintenance force. In a unit of fewer than twenty employees, the employer told the three most active union adherents on the day of the election that the union was no good and that they had better watch out "because if you go union you will see what will happen."[6] In refusing to issue a bargaining order the Board emphasized that there was little likelihood that the employer's illegal conduct would recur.[7]

One other example should suffice. In *Stoutco, Inc.*,[8] the Board refused to issue a bargaining order even though it agreed with the trial examiner that the employer committed violations of section 8(a)(1) in that its foreman told employees that if the union won recognition the employer would (1) hire a new foreman who would force more work out of the employees, (2) charge for items then provided free of charge, (3) penalize employees for any negligent handling of equipment, and (4) possibly close the plant if the union after recognition attempted to obtain more money from the employer. The foreman also told the employees that if they formed an independent executive committee and shunned the union, the employer would

---

1. NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed. 2d 547 (1969).

2. NLRB v. General Stencils, Inc., 438 F.2d 894, 904–905 (2d Cir. 1971).

3. 194 N.L.R.B. No. 172, 79 L.R.R.M. 1145 (1972).

4. 194 N.L.R.B. No. 172, at 3, 79 L.R.R.M. at 1146.

5. 194 N.L.R.B. No. 137, 79 L.R.R.M. 1065 (1972).

6. 194 N.L.R.B. No. 137, at 10, 79 L.R.R.M. at 1067.

7. 194 N.L.R.B. No. 137, at 4, 79 L.R.R.M. at 1066.

8. 180 N.L.R.B. No. 11, 73 L.R.R.M. 1107 (1969).

treat them favorably. The foreman also interrogated one member of the union's negotiating committee as to whether he had signed a union authorization card.[9]

These cases are simply not distinguishable from the instant one and mandate the same result. Given the preference for elections over authorization cards to establish a union's majority status,[10] given the close count as to the union's majority status in this case (11 out of 18, with two of the signing employees arguably not realizing what they were signing),[11] and given that the employer after retention of labor counsel demonstrated a willingness to abide by the results of an election, I would modify the Board's order by refusing to enforce the bargaining mandate.

---

9. *See also* Central Soya of Canton, 180 N.L.R.B. No. 86, 73 L.R.R.M. 1069 (1970) (no bargaining order even though 8(a)(1) violations in prohibiting employees from wearing union badges on company time, in promulgating and maintaining a rule prohibiting solicitation and distribution of any kind on premises without prior approval of management, in temporarily laying off employees who wore union badges; emphasis on, *inter alia,* unlikelihood of recurrence).

10. NLRB v. Gissel Packing Co., 395 U.S. 575, 596, 602–603, 89 S.Ct. 1918, 23 L. Ed.2d 547 (1969).

11. Employee Cyr testified that "[t]he only reason I put my name down on there was I didn't want to hear anymore about the union. And it was to get rid of her [Carol Watson, a fellow employee], and that's it." Cross-Examination of Albertine Cyr, Transcript of Hearing at 228, *reprinted in* Appendix at 165. Employee Marjorie Cianci testified that she signed a card without reading it and on the advice that anyone who did not sign a union card would lose his job if the union were recognized as the employees' bargaining agent. *Id.* at 308–309, Appendix at 188.