**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GENERAL STENCILS, INC., Respondent.**

**No. 265, Docket 34896.**

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1970.

Decided Jan. 19, 1971.

Michael Barkow, Atty., N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and John D. Burgoyne, Atty., N. L. R. B., Washington, D. C., of counsel), for petitioner.

Bertrand B. Pogrebin, Mineola, N. Y. (Rains, Pogrebin & Scher, and Joel H. Golovensky, Mineola, of counsel), for respondent.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

The most important issue on this petition to enforce an order of the National Labor Relations Board, 178 NLRB No. 18 is whether its findings of employer violations of § 8(a) (1), themselves challenged but in the main sustainable, warranted its placing this case in the "second" category recognized in NLRB v. Gissel Packing Co., 395 U.S. 575, 614–615, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and thus justified an order requiring the employer to bargain with a union which had achieved a card-count majority. The case comes to us after the delay unhappily characteristic of such proceedings. The alleged unfair labor practices occurred in the summer of 1967. The hearing was held, promptly enough, in December, and the Trial Examiner rendered his report in June 1968. The Board refrained from handing down its decision and order until August 1969, apparently to ascertain the outcome of Gissel. It then waited until May 11, 1970, to seek enforcement. Since its brief was not filed for another four months, the petition came before us only in December, 1970, nearly three years after the hearing, and three and a half years after the incidents with which we are concerned.

The employer, General Stencils, Inc., is a small company in Brooklyn, N. Y., engaged in the manufacture, sale and distribution of marking devices, etched name plates, and related products. The operation is supervised by Joseph Klugman, who has been the company's secretary and general manager for more than four decades and was 67 years old at the time of the hearing. Despite his impressive title, Mr. Klugman regularly donned overalls and spent his days in the plant, directing the production force, assisting in the work, and getting materials.

In 1961, District 50 of the United Mine Workers of America demanded recognition as representative of the production and maintenance workers on the basis of a claimed majority of authorization cards. Klugman refused to recognize the Union unless it was certified at a Board-conducted election. An election was held and the Union did not prevail. In 1966, another union sought recognition on the same basis, Klugman made the same response, and the same result ensued. District 50's second organizing effort, which gave rise to this proceeding, commenced around June 8, 1967.

Trial Examiner Maller found that by June 23, when the Union made its initial demand for recognition and bargaining,

it had authorization cards from 24 employees out of an appropriate unit of 32. While the employer challenges this determination in some respects, the finding is supported by substantial evidence, especially under the standard with respect to representations by card solicitors enunciated in *Gissel*, 395 U.S. at 604–609, 89 S.Ct. 1918. When Pohmer, the Union organizer, tendered the cards, Klugman declined to look at them, saying that he wanted an election. Pohmer said there was not going to be an election since the Union was filing a refusal to bargain charge, as it did that very day. Pohmer conceded that the Union could not win an election; about a week later, in another conversation with Klugman, he explained this pessimism as having arisen from the company's unfair labor practices.

In determining whether the employer had violated § 8(a) (1), the Trial Examiner put aside general statements wherein Klugman, without threatening reprisals or promising benefits, indicated his poor opinion of unions. He also rejected the testimony of several employees either as incredible or as not showing violations. At the same time, he refused to credit much of Klugman's testimony and found a number of § 8(a) (1) violations, hereafter discussed. Applying the Board's pre-*Gissel* standards, see Cameo Lingerie, Inc., 148 NLRB 535, 538 (1964); Hammond & Irving, Inc., 154 NLRB 1071, 1073 (1965), he concluded that, in view of Klugman's two prior experiences with union demands for recognition based on a claim of a card majority, of Pohmer's expressed pessimism about the possibility of a union victory in an election, and of Klugman's knowledge of employee sentiment, the employer had amply demonstrated its good-faith doubt, which was not vitiated by the adverse inference that might be drawn from the violations of § 8(a) (1). He therefore refused to recommend issuance of a bargaining order.

By the time the Board decided the case, the legal standard with respect to the issuance of bargaining orders had changed. It had now become "irrelevant that the employer may have a rational, albeit erroneous, doubt of majority or that he has a general distrust of cards." 178 NLRB No. 18 at 3 (mimeographed decision). It sufficed that the union in fact had a card majority and that the employer "engaged in widespread unfair labor practices during the Union's organizing drive, before and after receiving the Union's demand for recognition." *Id.* The Board here found such unfair labor practices on the grounds that the employer, in violation of § 8(a) (1), "interrogated employees about their union activities and evinced to employees its intention to revoke many existing privileges if they elected the Union," practices which "tended to destroy the employees' free choice by frightening them into withdrawing their allegiance from the Union and were of such a nature as to have a lingering effect and make a fair or coercion-free election quite dubious, if not impossible." *Id.* at 3–4. Accordingly, it issued an order which, in addition to directing the employer to cease and desist from the § 8(a) (1) violations listed in the margin,[1]

---

1. (a) Interrogating employees concerning their membership and/or interest in International Union of District 50, United Mine Workers of America, or any other labor organization of its employees, in a manner constituting interference, restraint, or coercion within the meaning of Section 8(a) (1) of the Act, or about any statements given to agents of the National Labor Relations Board.

(b) Threatening to enforce a no-smoking rule, if a majority of the employees selects International Union of District 50, United Mine Workers of America, or any other labor organization of its employees, to represent them.

(c) Threatening to impose a tardiness rule, and threatening employees with discharge through the implementation of this rule, if a majority of the employees selects International Union of District 50, United Mine Workers of America, or any other labor organization of its employees, to represent them.

ordered it to bargain with District 50 upon request.

## I.

### *The § 8(a) (1) Violations*

We shall deal first with the employer's challenges to the findings with respect to § 8(a) (1).[2] The evidence concerning unlawful interrogation came from three credited witnesses. Edna Gromalski testified that about the time she signed an authorization card, Klugman asked her whether she was going to be "with the Union or with him," adding that he was "not forcing the issue upon me, it is up to myself, whether I belong or whether I don't belong." She did not answer. He also asked whether she knew who had signed cards, and she untruthfully denied this. Duane Nicholas testified that Klugman asked whether he had signed a card, and he answered in the negative; apparently this was then the truth although he later signed one. Robert Kretschmer was asked who had attended a Union meeting on August 2, whether he had given a statement to the Board, and what it was.

■ The Board argues that the interrogation of Kretschmer as to what he told the Board agent falls within the ban of our decision in Henry I. Siegel Co. v. NLRB, 328 F.2d 25, 27 (2 Cir. 1964), and of the Sixth Circuit's decisions in NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750, 752–753 (6 Cir.), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965), and Surprenant Mfg. Co. v. NLRB, 341 F.2d 756, 762 (6 Cir. 1965). Unlike the situation in ·Henry I. Siegel Co., however, where we noted that the employer's requests for copies of statements given by employees to a Board investigator "did have an inhibitory effect on the employees' exercise of their right to have an effective investigation by the Board of alleged unfair labor practices," 328 F.2d at 27—to the extent that several employees were induced to destroy the copies of their statements, Kretschmer's testimony does not suggest that he felt himself subject to coercion—indeed, he apparently had no qualms in indicating to Klugman that he told the Board "the truth." We thus might have hesitated in sustaining the Board's finding on this issue were it not that we perceive no legitimate employer interest in the solicitation of such information under the circumstances here presented and an order condemning such questioning without proof of effect is thus justified.[3]

(d) Threatening to refuse to make loans to its employees, if a majority of the employees selects International Union of District 50, United Mine Workers of America, or any other labor organization of its employees, to represent them.

(e) Threatening to cease providing its employees with coffee breaks (or free coffee breaks), if a majority of the employees selects International Union of District 50, United Mine Workers of America, or any other labor organization of its employees, to represent them.

(f) Threatening to close the plant, if a majority of the employees selects International Union of District 50, United Mine Workers of America, or any other labor organization of its employees, to represent them.

(g) Threatening employees with layoffs if work is scarce, contrary to established practice of avoiding layoffs, if a majority of the employees selects International Union of District 50, United Mine Workers

of America, or any other labor organization of its employees, to represent them.

2. In doing this we shall include in the text only the employee testimony on which the Examiner relied and shall not state Klugman's version although it is not clear that the Examiner wholly rejected this. We likewise omit any discussion of the many inconsistencies within the testimony of the credited witnesses and the discrepancies between such testimony and statements given the Board when the events must have been fresher in their minds.

3. We express no opinion on whether this would be true if the employer could demonstrate that he was only and in good faith seeking information with which to prepare for a hearing on alleged unfair labor practices. This contention was made in the two Sixth Circuit cases noted above, but in both instances the court found that despite the legitimate employer

■ On the other hand, we do not see how the interrogation of Gromalski or Nicholas came within the Board's own criteria laid down in Blue Flash Express, Inc., 109 NLRB 591 (1954) and, more particularly, within the standards announced by this court in Bourne v. NLRB, 332 F.2d 47 (2 Cir. 1964), which we have so often cited and applied. See, e. g., NLRB v. Lorben Corp., 345 F.2d 346, 348 (2 Cir. 1965) (Marshall, J.); NLRB v. Rubin, 424 F.2d 748, 751 (2 Cir. 1970); NLRB v. Gladding Keystone Corp., 435 F.2d 129, 132 (2 Cir. 1970). Of the five elements there listed, items (2) and (4) are clearly negative in this case. Klugman did not "appear to be seeking information on which to base taking action against individual employees"; indeed, he affirmatively assured Gromalski that he was not doing this. The employees were not "called from work to the boss's office" and there was no "atmosphere of 'unnatural formality.'" Neither do we find any substantial case for the Board on items (1) and (3). The reference in Bourne to "a pattern of employer hostility and discrimination" with respect to unions was not to the common general expression of desire not to have a union in the shop but rather to specific manifestations of animus, of which unusual discipline or discharge of known adherents would be the most probative. A man working in overalls alongside the other employees is hardly what Bourne meant as being "high * * * in the company hierarchy," even though he was the highest the workers saw. Compare NLRB v. Rubin, supra, 424 F.2d at 751 (interrogation by managing partner— "the top man in the plant"); NLRB v. Gladding Keystone Corp., supra, 435 F. 2d at 132 (interrogation by "company's highest officer"); contrast NLRB v. Milco, Inc., 388 F.2d 133, 137 (2 Cir. 1968) (interrogation by general manager and two foremen, but conduct "barely meets the standards set out [in Bourne]"). This leaves only (5), which was not satisfied with respect to Nicholas but can be regarded as met in Gromalski's case by her untruthful denial of knowledge who had signed the cards. This alone is not enough.[4] We thus decline to enforce paragraph (a) of the cease and desist order, see fn. 1, except the clause relating to statements to agents of the Board.

The violations in the form of threats rested on the credited testimony of Kretschmer and two other employees, de Thomas and Lamattina. De Thomas was a smoker; although no-smoking signs furnished by the New York City Fire Department were posted in the plant, the company had done nothing to enforce this prohibition. Shortly before the Union meetings on June 22, Klugman told de Thomas that "[i]f the union got in, there would be a rule enforcing the no smoking rule." A few days later Klugman told de Thomas that in the same eventuality he would institute a rule whereby anyone late three times in a month would be fired. Marie Lamattina testified that during the second week in July, more than a month after she had signed a card, Klugman told her that if the Union came in and "if it got slow, he could lay us off * * * that he could stop the radio playing and not let us play it * * * and if we came in late, he could fire us for it. And he couldn't lend us any more money like he used to." Kretschmer's testimony went further. According to him, Klugman made sever-

interest in trial preparation, the conduct had exceeded the necessities of the situation. NLRB v. Winn-Dixi Stores, supra, 341 F.2d at 752–753; Surprenant Mfg. Co. v. NLRB, supra, 341 F.2d at 762–763.

4. In seeking to bring the cases within Blue Flash, the Board argues that, in view of Klugman's later refusal to inspect the Union cards and his demand for an election, there was "no possible legitimate excuse" for his asking the employees' views about the Union. Apart from other considerations, this implies an ability on Klugman's part to foresee the Board's abandonment of the good-faith doubt defense which even the experienced Trial Examiner did not possess.

al statements that he could always close the business down if the Union came in, and that he would also cut out the coffee breaks,[5] cease maintaining the close relationships he previously had with the workers, discontinue making loans to employees,[6] and stop the employees from smoking.[7]

The threat of closure was clearly a violation of § 8(a) (1) under the test laid down in Gissel, 395 U.S. at 618, 89 S.Ct. at 1942, strictly limiting permissible employer predictions on that subject, irrespective of their sincerity, to those "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control * * *." The case with respect to Klugman's remarks about loss of benefits is closer. In contrast to remarks in NLRB v. C. J. Pearson Co., 420 F.2d 695, 696 (1 Cir. 1969), and NLRB v. Central Power & Light Co., 425 F.2d 1318, 1323 (5 Cir. 1970), we entertain some doubt whether the Gissel test applies in all its severity to the discussion of such subjects. We do not see, for example, how it could be held, consistently with § 8(c), that an employer may not tell employees that if a union presses demands for greater benefits, typically higher wages, as it presumably will have to do in order to justify the collection of dues, he will endeavor to compensate for any extra expense of that nature by negotiating for the elimination of benefits the employees have enjoyed in the past, less directly measurable in dollars but contributing to cost, such as providing loans or free coffee breaks, and retention of employees during slow periods—and this even though the employer might be able

both to pay higher wages and continue the benefits if he were able to raise his prices or content to reduce his profits. If that be so, it would defy reality to insist that a man in overalls, working on the plant floor, should precisely adhere to the niceties of expression that would be used by a careful lawyer trained in labor relations law. On the other hand, Klugman's remarks went a considerable distance beyond those held not to constitute an unfair labor practice in NLRB v. Golub Corp., 388 F.2d 921, 929 (2 Cir., 1967), where the employer "made it clear enough that he would not aim to withdraw special privileges if a union contract were signed, and certainly not to withdraw them in retaliation for the union contract, but that he feared that the rules of the contract or the union's administration of it might forbid giving such benefits to one employee unless they were uniformly given to all." Here, on the credited testimony, there was a more distinct flavor of reprisal; at least the Board was entitled to draw that inference. On the facts permissibly found by the Examiner, the Board could regard Klugman's statements not as good-faith predictions of what he sincerely believed he would be compelled to do in the event of unionization or what he proposed to seek to accomplish at the bargaining table as a counter to increased wage demands, but rather as threats not rooted in any solid business purpose and designed mainly or even solely to prevent employees from supporting the union. That is what the Board found—"threatening employees with reprisals if the Union won the election," 178 NLRB No. 18 at 2 (mimeographed decision)—and it is upon that

5. Kretschmer was uncertain whether the threat was to cut out the breaks altogether or merely to stop providing free coffee and the free cake that had been furnished during the afternoon break.

6. The Examiner found that "[r]espondent makes loans to employees from time to time, pays their doctor's [sic] bills when they are sick, and keeps them on the pay-

roll, instead of laying them off, when business is slow." 178 NLRB No. 18 at 5 n. 6 (mimeographed decision).

7. Klugman denied making any of these threats except that he had told Kretschmer that "if the union got in, it sets up a wall and there would be no more close relationships with employees."

basis that we grant enforcement.[8] We do not regard NLRB v. Taber Instruments, Division of Teledyne, Inc., 421 F.2d 642, 643–644 (2 Cir. 1970), as suggesting a less rigorous standard for statements of this type. Two of the three statements referred to in that case specifically adverted to the possibility of plant closure within the interdiction of *Gissel*. In the third the superintendent suggested that defeat of the union might improve the employee's work assignment whereas he "didn't know what would happen if the union won." This was clearly a forbidden promise of benefits realizable only upon the union's defeat.

## II.

### The Bargaining Order

It is upon this basis that we reach the question whether the Board was justified in finding Klugman's conduct to have been such "that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order," or whether the case fell into the "third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order," 395 U.S. at 614–615, 89 S.Ct. at 1940. In approaching that issue we are mindful

of the admonition, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939, that "[i]t is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity," since "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts."

Despite this observation we do not believe the Court thought that all the Board needed to do in deciding whether to dispense with the admittedly superior method of the election process to determine employee sentiment, 395 U.S. at 603, 89 S.Ct. 1918, was, in Judge Goldberg's apt phrase, to use "a litany, reciting conclusions by rote without factual explication," NLRB v. American Cable Systems, Inc., 427 F.2d 446, 449 (5 Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). Despite the Board's aversion to utilizing its rulemaking powers[9] and the conceded impracticability of framing a rule that would cover every possible variation of employer misconduct, this is a situation where Professor Davis' proposal of a rule "limited to resolving one or more hypothetical cases, without generalizing,"[10] would reveal at least some of the Board's thought processes to unions, employers, and reviewing courts, and would bring about a degree of certainty and uniformity that, as will appear below, does not seem to have been

---

8. The cease and desist order seems to have been carefully framed to prohibit only *threatening* the employees that the employer would take action of the sort there described if they should choose to select Local 50. It does not say that the employer could not take such action once it had recognized District 50 as the collective bargaining agent. While we express no opinion whether this would be an unfair labor practice on the facts of this case, at least one court has held that an employer which, even before recognizing the union, tightened up its policy with respect to making personal loans and issued a written set of working rules (previously in effect but not enforced)

did not commit an unfair labor practice in so doing. NLRB v. Cosco Products Co., 280 F.2d 905, 908–909 (5 Cir.1960). See also NLRB v. Peerless Products, Inc., 264 F.2d 769, 772 (7 Cir. 1959) (no unfair labor practice by calling in small personal loans for repayment during organization campaign).

9. See Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L.J. 729 (1961), and 1 Davis, Administrative Law Treatise § 6.13 at 147–50 (1965 pocket part).

10. Discretionary Justice, A Preliminary Inquiry 59–60 (1969).

attained. Failing that, there could be an opinion by the full Board illuminating how it meant to apply its *Gissel*-given authority—a course particularly important for an agency that is forced by the press of business so often to delegate its authority to three-member panels. Failing that, the Board should explain in each case just what it considers to have precluded a fair election and why, and in what respects the case differs from others where it has reached an opposite conclusion. Detailed explication of this sort is peculiarly necessary because of the possibility, which has here become an actuality, that a reviewing court will vacate one of the § 8(a) (1) findings on the "totality" of which the Board relied to justify a bargaining order, and the consequent possible need for a remand unless the court can be satisfied that the error did not affect the command to bargain.

The Board's decision here finds the employees were frightened by the interrogation concerning their union activities and the employer's announced intention "to revoke many existing privileges if they elected the Union." 178 NLRB No. 18 at 3 (mimeographed decision). Insofar as the first item relied on the interrogation of Gromalski and Nicholas, that prop has now been removed, and we surely have power to remand for a determination whether the Board would regard the totality of circumstances as being the same with this subtracted from the total. On the other hand, if there had been evidence of widespread dissemination of the threat of plant closure (such as the speech, the letters and the pamphlet sent to all employees in the *Sinclair* case, 395 U.S. at 587–589, 89 S. Ct. 1918), this would so clearly support a bargaining order that remand because of error in another finding would be a useless formality. But there is no such evidence [11] and, doubtless for that reason, the Board did not even refer to a threat of plant closure in its discussion of the factors justifying its conclusion that the chance of a fair election had been impaired.

This leaves us with the unlawful interrogation of Kretschmer about his statement to the Board agent, not shown to have been communicated to anyone, and the threats to a few employees to

---

11. The only employee who testified to such a threat was Kretschmer. The threat would scarcely have frightened him since he intended to leave soon for another job, and neither he nor any of the eighteen other employees called by the General Counsel testified that he had passed the word along. Counsel for the Board rely on a statement in Bausch & Lomb Optical Co. v. NLRB, 217 F.2d 575, 576 (2 Cir. 1954), which they quote as follows:

"* * * * Any expressions of company attitudes, even to small groups of individuals, were likely to be rapidly disseminated around a plant during the struggle of organization."

This was the second clause of a sentence dealing with § 8(a) (1) violations which began

"These incidents cannot be dismissed as de minimis, as the company contends, since any expressions" etc.

Here the issue of dissemination was raised, at least tangentially, by the employer's impressive claim that the idea that Klugman would have selected an employee known to be leaving as the object of threats of plant closure was incredible.

All the Examiner could say in answer was that "It is not inconceivable that Klugman would have made those statements to Kretschmer in the hope that Kretschmer would disseminate these statements among the other employees." 178 NLRB No. 18 at 6 (mimeographed decision). Belief about what is "not inconceivable" about what Klugman hoped, while relevant to the issues of Kretschmer's credibility and of violation of § 8(a) (1), is a long way from proving a dissemination which would make a fair election improbable. Likewise, the statement in Irving Air Chute Co. v. NLRB, 350 F.2d 176, 179 (2 Cir. 1965), that "proof of the actual effect [with respect to dissemination] of the Company's threats is not required in view of their inherently coercive nature," while true enough as to the existence of the § 8(a) (1) violation there under discussion, does not support the propriety of a bargaining order where the Board must determine whether the employer's unfair labor practices were likely to undermine the possibility of holding a fair election.

withdraw benefits of a relatively minor nature. We have found no case sustaining a bargaining order on the basis of such elements alone. Contrast NLRB v. L. B. Foster Co., 418 F.2d 1 (9 Cir. 1969), cert. denied, 397 U.S. 990, 90 S. Ct. 1124, 25 L.Ed.2d 398 (1970) (coercive interrogation of employees, telling three employees they were being laid off because of their support of the union, telling three others that "if anyone in the shop had a union card they wouldn't be working there," and threatening at least one employee that the employer would close the plant if it became unionized); NLRB v. Lou De Young's Market Basket, Inc., 430 F.2d 912 (6 Cir. 1970) (three discriminatory discharges, unlawful interrogation of two employees, threat to fire two employees one of whom was soliciting the other's union support, and promulgation of no-solicitation rule); G. P. D., Inc. v. NLRB, 430 F.2d 963 (6 Cir. 1970) ("a classic pattern of violations" including the discriminatory discharge of four of seven union adherents out a total working force of eight); NLRB v. Marsellus Vault & Sales, Inc., 431 F.2d 933 (2 Cir. 1970) (general threats of plant closure, promises of benefits, and persuasion to form separate union); Byrne Dairy, Inc. v. NLRB, 431 F.2d 1363 (2 Cir. 1970) (threat of plant closure and loss of benefits made to all employees); NLRB v. Int'l Metal Specialties, Inc., 433 F.2d 870 (2 Cir. 1970) (threats of plant closure and loss of benefits, unilateral wage increases, and persuasion to form grievance committee thus by passing union).

It deserves emphasis that the Court noted in *Gissel,* 395 U.S. at 611 n. 31, 89 S.Ct. 1918, that threats to eliminate benefits had been shown to have very much less effect on rerun elections—and thus presumably on elections—than threats of plant closings, and cited statistics impressively confirming this. Evidently the American working man who wants a union has enough sturdiness and sufficient confidence in the union's ability to protect him that he is not cowed by employer threats to cease the distribution of free doughnuts or to enforce no-smoking rules if the union comes in. We thus have considerable doubt whether the Court contemplated that bargaining orders would be entered on the basis of such threats alone, and indeed whether the Board would have done so here in the absence of its erroneous conclusion with respect to the unlawful interrogation of Gromalski and Nicholas.

We are impressed also by the employer's citation of three post-*Gissel* cases in which the Board has declined to issue a bargaining order on the basis of unfair labor practices that would seem to cast more doubt on the likelihood of a fair election than those established here. In Stoutco, Inc., 180 NLRB No. 11 (1969), there were repeated threats by a foreman of "loss of existing benefits, plant closing or the imposition of harsher working conditions * * * in the attempt to dissuade the employees from joining or supporting the Union," *id.* at 2 (mimeographed decision of Board), a "suggestion" by the company's president that a union activist should quit, and a prediction that he would be gone after the election.[12] In Schrementi Bros.,

---

12. While *Stoutco* might be distinguished on the ground that the card-count majority was achieved only after the union's demand for recognition and that this was one of the grounds on which the Trial Examiner dismissed the § 8(a) (5) charge, the union achieved its majority soon after the demand, and the Board usually considers the demand to be a continuing one. In any event it would be sheer speculation to guess that this was the reason for the decision. Instead of explaining why "employee sentiment once expressed through cards" would not be better protected by a bargaining order than by the rerun election which it ordered, the Board proffered only the following:

> In all the circumstances of this case, we find that the Respondent's conduct tended to inhibit a free choice by the employees and necessitates the setting aside of the election.

Inc., 179 NLRB No. 147 (1969), the Board found that the employer in the presence of his employees had threatened and physically assaulted non-employee union organizers in the company's store and on an adjacent parking lot, and had informed an employee that the names of employees visited at home by the union organizer had been "checked out." Yet despite the union's having had a card-count majority when it demanded recognition, the Board refused to issue a bargaining order, saying only:

> With this [the *Gissel*] standard in mind, we conclude that the Respondent's misconduct was not sufficiently flagrant to prevent the conduct of a fair rerun election. The 8(a) (1) violations found here were neither so extensive in number nor pervasive in character that they warrant an 8(a) (5) finding or require a bargaining order to remedy their unlawful effect.

179 NLRB No. 147 at 4 (mimeographed decision). Still harder to reconcile with the decision here is Blade-Tribune Publishing Co., 180 NLRB No. 56 (1970). There, on remand—at the Board's suggestion—from the Ninth Circuit, 71 LRRM 3104 (1969), the Board reversed a previous decision, 161 NLRB 1512 (1966), in which it had issued an order to bargain with a union which had a card-count majority when it demanded recognition, in accordance with a recommendation of the same Trial Examiner as in this case. As the Board found, the company's principal stockholder, editor, and managing director, in violation of § 8(a) (1), had systematically interrogated 13 of the 22 unit employees in his office and had interrogated most of his employees either singly or in pairs during a series of luncheons paid for by the company and extending into company time. The Board further found that the company foreman, with the managing director's knowledge and in violation of § 8(a)' (1), had imposed a "double-back" work schedule—which theretofore had never been required of any company employee —on a union activist with the intention of forcing him to quit the company's employ and thereby to serve notice on all other employees that adherence to the union would result in similar reprisals. Although the *Blade-Tribune* decision came down four months after the order in this case, the Board made no attempt to explain the difference in treatment but contented itself with an *ipse dixit* that *Blade-Tribune* fell within the category of "minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order," 395 U.S. at 615, 89 S.Ct. at 1940, quoted in 180 NLRB No. 56 at 2 (mimeographed decision).

■ The Supreme Court's emphasis, in fn. 32 of the *Gissel* opinion, on the respect to be given the Board's decisions concerning the appropriate remedy surely was not meant totally to overrule in this area the famous statement in Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951), that "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function," including the responsibility placed on them by the Administrative Procedure Act, 5 U.S.C. § 706(2) (A), to prevent capricious determinations by administrative agencies. See the remarks of Mr. Justice Douglas dissenting in United States v. Wunderlich, 342 U.S. 98, 101, 72 S.Ct. 154, 96 L.Ed. 113 (1951), and New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 96 L.Ed. 662 (1951). Bargaining orders are not

However, contrary to the contention of both the Charging Party and General Counsel, we do not believe that, in all the circumstances of this case, the unfair labor practices were of such a nature as to warrant imposition of a bargaining order.

180 NLRB No. 11 at 3 (mimeographed decision). Such a statement tells nothing and is as unfair to the charging union and the General Counsel as the "litany" is to the employer in a close case.

immune from the great principle that like cases must receive like treatment. While the Board has wide discretion in framing remedies, the agency has a correlative duty to explain its imposition of a remedy in one case and its failure to do so in a seemingly similar—or even stronger—one on a basis reviewing courts can understand.[13]

■ When we combine the invalidity of the Board's conclusion with respect to the interrogation of Gromalski and Nicholas, the lack of evidence that the threat of plant closure was known to anyone but Kretchmer and the consequent failure even to mention this in the discussion of the propriety of a bargaining order, the figures cited in *Gissel* concerning the rather small effects of threats of loss of benefits on elections, and the lack of intelligible explanation of apparently differing results in other cases where the case for a bargaining order was at least as strong, we are convinced that the appropriate course is to vacate the bargaining order and remand this portion of the case to the Board for further findings and conclusions. In this connection the Board may find it desirable to take additional evidence with respect to employee turnover, see NLRB v. American Cable Systems, Inc., *supra*, 427 F.2d at 448 and the dissent of Judge McCree in G. P. D., Inc. v. NLRB, *supra*, 430 F.2d at 965–966, or on other matters—a course that would seem particularly appropriate in light of the fact that the case was tried on the basis of a legal standard different from that now applied.

We therefore:

1) Modify paragraph 1(a) of the Board's order to read:

"(a) Interrogating employees about any statements given to agents of the National Labor Relations Board" and grant enforcement as so modified;

2) Grant enforcement as to paragraphs 1(b), (c), (d), (e), (f), (g), (i), and 2(c);

3) Vacate paragraphs 1(h) and 2(a) and remand the question of issuance of a bargaining order for further proceedings not inconsistent with this opinion; and

4) Order that the notice referred to in paragraph 2(b) be modified in a manner consistent with the above directions.

No costs.

---

13. See the well-known statement by Judge Frank, surely no foe of the administrative agencies, dissenting in Old Colony Bondholders v. New York, N.H. & H.R.R., 161 F.2d 413, 449–452 (2 Cir.), cert. denied, 331 U.S. 859, 67 S.Ct. 1755, 91 L.Ed. 1866 (1947).