**HARPER & ROW PUBLISHERS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 72-1218.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 8, 1973.

Decided April 16, 1973.

Steve R. Semler, Atty., N. L. R. B., Washington, D. C., for respondent.

Michael J. Tannler, St. Louis, Mo., for petitioner.

Before MATTHES, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This case had its origin in an effort by certain of the employees of the Petitioner, Harper & Row Publishers, Inc. (hereinafter, the "Company"), to unionize their plant, affiliating with (originally) Teamsters Local 682.[1]

---

* Hon. Talbot Smith, Senior United States District Judge, Eastern District of Michigan, sitting by designation.

1. The full name of the Union is Construction, Building Material, Ice and Coal, Laundry, Dry Cleaning and Industrial

Upon Complaint issued, a hearing was held, as a result of which the Trial Examiner concluded that the Company had committed unfair labor practices in violation of Sections 8(a)(1), (3) and (5) of the National Labor Relations Act and recommended remedial action, including an order that the Company bargain with Teamsters Local 682. The Board (with the Chairman dissenting as to one point) sustained the Trial Examiner and ordered that the Company cease and desist the unfair practices found, and take certain affirmative action, including an order to bargain.[2] The matter is before us on the Company's petition to review and on the Board's cross-application for enforcement of its order. We have jurisdiction under Sections 10(e) and (f) of the National Labor Relations Act, as amended (29 U.S.C., Sec. 151 et seq.).

Again we are faced with the bargaining order problem. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); N.L.R.B. v. Arrow Specialties, Inc., 437 F.2d 522 (8th Cir. 1971); Howard Mfg. Co., Inc. v. N.L.R.B., 436 F.2d 581 (8th Cir. 1971); N.L.R.B. v. Regal Aluminum, Inc., 436 F.2d 525 (8th Cir. 1971); Ace-Alkire Freight Lines, Inc. v. N.L.R.B., 431 F.2d 280 (8th Cir. 1970); Hy-Vee Food Stores, Inc. v. N.L.R.B., 426 F.2d 763 (8th Cir. 1970), cert. denied, 400 U.S. 879, 91 S.Ct. 120, 27 L.Ed.2d 116 (1970). Although we grant enforcement in part, we will not sustain the Board's bargaining order. In view of the fact that such order involves, and to a large degree depends upon the Board's findings as to the unfair labor practices charged (and found) we will examine in some detail the evidence relevant thereto.

The Company is engaged in the publication, sale and distribution of books and other printed materials. In Troy, Missouri, it maintains a warehouse, the facility involved in the present controversy. Early in March, 1971, two employees, William Creech and Dennis Hickman, contacted Anthony Parrino, the business agent of Local 682, and arranged a meeting at the home of Mary Geraldine Creech to discuss unionization. At this meeting all of the employees present signed authorization cards for the Union. The following day, March 11, there was much activity in and around the plant respecting the signing of authorization cards, as well as on subsequent days. By March 15th, some four days later, Local 682 had obtained cards signed by 45 employees, including one signed by an office clerical employee. (At this time there were approximately 80 employees at the warehouse, including nine office clerical employees). The following day, March 16, Eugene Walla, President of Local 682, accompanied by Anthony Parrino, went to the Company's office and asked to see the Plant Manager, John Misiura. The Trial Examiner credited Walla's version of the meeting, namely, that he (Walla) "had secured authorization cards for representation of employees of his particular firm" and asked if "he would recognize the local union as the bargaining agent for these employees." Mr. Misiura replied that "he didn't believe that we represented anybody" and that "we could get off his property immediately." Mr. Noto (the plant engineer) who was standing nearby stated that they couldn't negotiate, that their supervisors were in New York and their lawyers in St. Louis. Walla replied that they did not seek negotiations at that time but merely recognition of Local 682 as the bargaining representative, warning Misiura not to discriminate against any employees who had sought representation by Local 682. Misiura replied that he had told them once to get off the

---

Laundry and Dry Cleaning Drivers, Helpers, Warehousemen, Yardmen and Allied Workers—Local Union 682. It is an Affiliate or Constituent Unit of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. The Order is reported at 196 N.L.R.B. No. 50.

grounds and threatened to call the sheriff. Walla and Parrino then left, with Walla's announcement that "I think I will just throw a picket around here tomorrow." That night a strike was voted and on the following day picketing began. On the same day Local 682's attorney filed with the Board's Regional Office a Petition for Election.

In late March, counsel for the Company and Local 682 discussed practical means for settling the strike. It was agreed to seek an early election. President Walla at a meeting on Sunday, April 4, recommended a discontinuance of the strike and the picketing was discontinued the next morning, April 5.

The 8(a)(1) violations involve what were found to be threats, coercive interrogations, and promises. The day (March 11th) following the meeting at the home of Geraldine Creech was, as noted above, a day of great unionizing activity. In Plant Engineer Noto's words "  .  .  a big beehive of something was up." Mr. Misiura questioned employees Lavern Creech and Emmett Cope as to whether or not they had signed union cards. He also asked whether Ronnie Hurst was acting in the effort at unionization, learned that he was, and that Creech, Hickman, and the temporary girls [3] were interested in the union movement. Misiura later called in Horst, questioned him regarding his union views, asked if he had signed a card, and requested his cooperation in reporting on the union activities of other employees. Mr. Noto also questioned his subordinates concerning the union cards, stated that if a union got in, the Company "would not provide as many benefits." In addition, he reminded employee Winter that he was still a temporary employee and not permanent and,

in addition, that with a union there would be loss of certain benefits.

In addition it was found that the Company, on March 16th, granted wage increases to Class II personnel, in a hasty action attempting to demonstrate the lack of need for union representation and to discourage the organizing efforts then going on. Grants of additional wage increases and other benefits were also found to have been made during the strike for the same purposes.[4] Subsequent to the strike it was found that Jerry Creech had not only been assigned new and different work, intended to hamper her on-going union activities, but that her work (and that of Oscar Westoff) had been criticized in a manner intended to warn them of the Company's disapproval of their active roles during the strike.

It was also found that the Company had been guilty of anti-union discrimination in violation of Section 8(a)(3) and (1) of the Act in the discharge of employees Creech and Hickman, who had been active in the organizing activities. Similar violation was found in the layoffs of Temporary Class II women (who had been particularly critical of their pay differentials) on both March 11 and March 16, for the purpose, it was found, of presenting an object lesson to other employees of serious adverse consequences attendant upon adherence to the union movement. The Company's refusal to rehire James Floyd stemmed, it was found, also from his joining in the strike. An additional result of the strike, it was found, was the Company's continuing discrimination, in violation of Section 8(a)(3) and (1) of the Act, against Temporary Class II women after the strike, in that they were not fully reinstated to their former positions.

---

3. Upon its opening in May, 1970, the Company set up two major hiring classifications, Class I and Class II. Class I, a higher pay bracket, consisted of men performing heavier work and Class II was largely composed of women doing lighter work. Within each class there were both "temporary" and "permanent" employees, the latter enjoying higher pay

and benefits not granted to the temporary employees.

4. The Chairman did not agree with the balance of the panel that the Company discriminated against striking employees by adoption of a new wage increase schedule.

■ Violation of Section 8(a)(5) and (1) of the Act was found in the Company's refusal to bargain collectively with Local 682. The Union alleged in the complaint, as amended, consisting essentially of all warehouse and maintenance employees, was found to be an appropriate unit.[5] We have heretofore summarized the circumstances of the meeting between Misiura, Noto, Walla, and Parrino, at which time, the Trial Examiner found, there was a "summary rejection" of Walla's request for recognition.

To most of the above the Company, in the course of extensive proceedings before the Trial Examiner, offered various explanations. As to conversations held, and which were found to be coercive and restraining, the version of its witnesses was often at direct variance with the version of the union witnesses. Thus, as to the Misiura-Cope-Creech meeting on March 11, which the Examiner has interpreted as coercive, it is argued that the matter of the union cards came out, not through probing by Misiura, but as volunteered by the employees, and that such discussion, including Horst's "pushing for the Union," in the context of the entire conversation, did not descend to the level of coercive interrogation. Similarly with respect to the Noto-Mozier-Coose discussion of the same date. The references to cards, it is agreed, came up in the course of an hour and forty minute conversation in which many other matters were discussed. The inquiries as to cards was said to be casual, and at no time were coercive threats made. As to the Noto-Winter conversation, with its alleged reminder to Winter that he was only a temporary employee, the Company argues that Winter had in fact been made permanent, and to his knowledge, days before the conversation and hence his testimony was confused and unreliable.

The discrimination allegedly practiced against the temporary employees in their March 11 lay-off is sought to be justified on the ground that critical electronic equipment on which these employees relied (to keep them supplied with orders) was broken down, with the result that the Company could not employ their services. Routine business operation was also the evidence adduced as to the March 16 increase in pay, it being argued, with supporting testimony, that the pay differential involved had been under study for some time, and that home office approval of the increase had not been received by Misiura until March 15th, and hence the pay increase, involving a fundamental change in pay structure, simply could not have been a spontaneous reaction to Walla's claim.

■ We think it would serve no useful purpose to further elaborate upon the pro's and con's of these various incidents. We are not called upon to weigh the testimony, to array charge against explanation. Our problem, rather, is whether there is substantial evidence in the record as a whole to support the Board's determinations, bearing in mind that it may draw reasonable and fair inferences from the evidence it finds to be creditable. Arbie Mineral Feed Co. v. N.L.R.B., 438 F.2d 940 (8th Cir. 1971). Mindful of the teachings of Universal Camera Co. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we have carefully reviewed the entire record and are left with the firm conviction that the Board's findings as to the 8(a)(1)

---

5. The Company argues that Local 682's request for bargaining included office clerical employees, a unit not appropriate for collective bargaining, which inclusion also constituted a variance between the unit with respect to which bargaining was requested and that alleged in the complaint as amended to be the appropriate unit. The objection is not well taken, we agree, in view of the fact that the Company failed to ground its refusal to bargain on this basis, Colecraft Mfg. Co. v. N.L.R.B., 385 F.2d 998 (7th Cir.). Moreover the variance was insubstantial. Brewery and Beverage Drivers Local No. 67 v. N.L.R.B., 257 F.2d 194 (D.C.Cir. 1958).

and (3) violations are supported by substantial evidence.

We now turn to the bargaining order. It was the order of the Board, affirming the Trial Examiner's rulings, findings, and conclusions, and adopting (with slight modifications) his recommended order, that "The Respondent, Harper & Row Publishers, . . . shall . . .

"(f) Upon request, recognize and bargain collectively with the above-named labor organization, as the exclusive representative of all employees in the appropriate unit stated in the Conclusions of Law above with respect to rates of pay, wages, hours of employment and other terms and conditions of employment, and if an understanding is reached, embody such understanding in a signed agreement." [6]

The Trial Examiner had concluded that ". . . the Respondent's all-pervasive unfair labor practices precluded its employees from exercising a free choice in an election . . ." [7] The Company vigorously contends that such conclusion is unjustified on the record and the bargaining order likewise unsupported thereon.

Our guidelines is this area are found in N.L.R.B. v. Gissel Packing Co., *supra.* Particularly pertinent for our present problems is the Court's holding that

"It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." 395 U.S. at 612, n. 32, 89 S. Ct. at 1939.

We take it, however, that the Court's emphasis, thus stated, was not intended to overrule its well-known statement in Universal Camera Co. v. N.L.R.B., *supra,* that "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function" in order to do justice between the parties and thus .fulfill their ultimate responsibilities. N.L.R.B. v. General Stencils, Inc., 438 F.2d 894 (2nd Cir. 1971).

█ Although the Company, as we have noted, raised various defenses and objections to the cards, we find that there is substantial evidence to support the Board's view that the union represented a majority of the appropriate bargaining unit at the time it demanded recognition. That there were numerous unfair labor practices is clear. The employer obviously did not want a union in the plant. But what is not clear upon the record, far from there being substantial evidence thereof, is that these practices had any undermining effect, indeed, any demonstrable effect upon unionization, or would have upon the election machinery.

It has been established that the union had a majority on March 16th. Prior to this date had occurred the Mozier-Noto conversation, the Winter incident, the Misiura-Cope-Creech coercion, the layoff of March 11th, and the discharges of Creech and Hickman. The wage increases to Class II personnel, constituting interference and restraint, occurred on March 16th. The record is barren of any erosion of union support by company action subsequent to its attainment of a majority. In fact the record demands the opposite conclusion: additional authorization cards were signed on the day after the strike, picket lines of 10 or 12 people were "up at all times," [8] meetings were held, in fact one in a large meeting hall in the neighboring town of Wentzville. There is thus

6. Ap. 92–93

7. Ap. 90

8. App. 205

affirmative evidence that the unfair practices did not undermine the union majority and it is significant to us in appraising the causal connection between unfair practices and union erosion, N.L.R.B. v. Drives, Inc., 440 F.2d 354 (7th Cir. 1971) that the unfair practices preceded in large part of the successful card signing campaign. "Evidently", as the court observed in N.L. R.B. v. General Stencils, *supra,* "the American working man who wants a union has enough sturdiness and sufficient confidence in the union's ability to protect him that he is not cowed by employer threats . . .".

The situation before us is essentially that described in our opinion in Arbie Mineral Feed Co. v. N.L.R.B., *supra,* where, in ruling upon the bargaining order there before us we held

"(3) Where the evidence establishes that the unfair labor practices produced little or no impact upon the employees' allegiance to the union, we deny enforcement." 438 F.2d at 945.

An additional problem, however, with respect to the enforcement of the bargaining order is presented by the events of March 29th. As a result of discussion within Joint Council No. 13 of the Teamsters (a council of all the Teamsters' Locals in the St. Louis area) it had been decided that Local 688 was a more appropriate local to represent the warehouse workers than Local 682, which had obtained the authorization cards and had requested recognition.

Accordingly Local 682 scheduled a meeting of the Company employees in Wentzville on the night of March 29th. This meeting was attended by 32 employees and presided over by President Walla of Local 682. He explained that the work of the Company's employees was not within the jurisdiction of Local 682, a construction local, that Local 688, which customarily represented warehouse employees, could represent them better, that Local 682 had a high dues

structure but that the Company's employees, who were on a lower wage schedule, would be paying the same dues, presenting a situation which would breed dissatisfaction. The matter was put to a vote, the majority voted to go into Local 688, sign their authorization cards, and the meeting was turned over to Mr. Dunn, an organizer for Local 688. Mr. Dunn generally supported President Walla's analysis of the situation respecting the two unions. Cards were passed out before the meeting adjourned and all employees present signed with Local 688. The result of the meeting was clearly an affiliation with Local 688. As President Walla put it "When they voted they knew they were going with 688." [9] Anthony Parrino, business agent for Local 682, expressed the same understanding, namely, that Local 688 was to take over the representation, "that's what the meeting was about." [10]

Local 688, however, did not want the Company's employees. The Executive Officer of Local 688, Mr. Gibbons, notified Walla that they (688) were not interested in representing the Harper & Row people. Walla replied to Gibbons that Local 682 would never again relinquish jurisdiction over the employees concerned. Another meeting of the employees was then called by Walla. They were informed of the most recent development and that Local 682 would be representing them, would "take them all the way through now." There was no vote at the meeting. No cards reinvesting Local 682 with authority were signed and Local 688 faded out of the picture. The strike continued, using Local 682 materials on the picket lines.

The Board, however, has held, adopting the Trial Examiner's bargaining order, that Local 682 never lost its majority status through the foregoing, stating that "we would take a different view, however, had the employees abandoned 682 and made a genuine and unconditional shift to another union." [11] The

9.  App. 217

10.  App. 227

11.  fn. 2, App. 127–128

reference to "unconditional" is apparently upon the theory that the shift over to Local 688 was upon a condition, namely, that Local 688 actually take over as the bargaining agent. The Board apparently relies here upon the testimony of one William Schneider, described as a representative of Teamsters Joint Council 13, who in turn quotes Mike Dunn, a representative of Local 688, as having so told the meeting. But accepting that the remark was in fact made, it was no more than a remark. There was no discussion thereof, nothing hinged on it, no warning to the membership of their situation should the take-over not occur, and, significantly, there is no mention of, or allusion to, in the minutes of the meeting of this remark, now asserted to govern, in legal effect, the entire situation as a condition subsequent. It is abundantly clear on the record, of course, that Local 688 never did take over. But it is equally clear that the employees made a genuine and unconditional shift to Local 688 and there is no substantial evidence that they did so upon condition subsequent. What actually happened simply was that the membership was talked out of Local 682 by its President and signed up with Local 688, only to be rejected a few days later by the Local of their new affiliation. In this unusual situation, peculiarly appropriate is the admonition in *Gissel, supra,* that once having a union majority, together with employer unfair practice, "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior." (395 U.S. at 614, 89 S.Ct. at 1940) Here the union majority was not lost through the Company's unlawful practices but through voluntary disaffiliation by the employees themselves. The employee free choice, upon the peculiar facts of this case, should not be held to rest upon the card authorizations of March 16th.

We have examined the remaining issues argued by the parties and find that they are either without merit or controlled by the foregoing.

In sum, we deny enforcement of the bargaining order. In all other respects the order of the Board is enforced.