NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Local 917, an Affiliate of the International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America,
Intervenor,

v.

JAMAICA TOWING, INC., Respondent.

No. 1214, Docket 79–4049.

United States Court of Appeals,
Second Circuit.

Argued June 14, 1979.

Decided July 24, 1979.

Corinna Metcalf, Washington, D. C. (John
S. Irving, Gen. Counsel, John E. Higgins,
Jr., Deputy Gen. Counsel, Robert E. Allen,
Acting Associate Gen. Counsel, Elliott
Moore, Deputy Associate Gen. Counsel, N.
L. R. B., Paul J. Spielberg, Deputy Asst.
Gen. Counsel, David F. Zorensky, Atty., N.
L. R. B., Washington, D. C.), for petitioner.

Carl A. Schwarz, Jr., New York City (Finley, Kumble, Wagner, Heine & Underberg, Raymond L. Vandenberg, New York City, Donald T. Carmody, Elmira, N. Y., of counsel), for respondent.

Before MANSFIELD, MULLIGAN, and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order entered by it on July 19, 1978 finding that respondent, Jamaica Towing, Inc. committed multiple violations of §§ 8(a)(1) and (a)(5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) and (a)(5),[1] in the course of a union representation election and directing respondent to bargain with Local 917 of the International Brotherhood of Teamsters (the Union). We affirm the findings of illegality but set aside the bargaining order and remand the case to the Board for further consideration of the appropriate remedy.

Jamaica Towing is a small corporation, wholly-owned by its president and manager, Mr. Anthony Giorgianni, which provides automobile towing and body repair services from facilities located in Jamaica, New York. At the time of the events which are the subject of this lawsuit, January-February 1976, it employed eight licensed tow-truck operators, in addition to an unspecified number of mechanics, servicemen, and clerical employees who are not involved in this action.

On January 17, 1976 two business agents of the Union met with seven of the eight drivers, distributed single purpose cards authorizing the Union to represent the signatories for collective bargaining purposes and informed the drivers that the cards would first be used to obtain recognition from the employer and, if that were unsuccessful, to petition the Board to conduct an election. All seven employees present signed and returned the cards, whose authenticity is not disputed.

A few days later the Union sent Giorgianni a telegram demanding recognition on the basis of the card vote. When this demand was rejected, the Union filed on January 21, 1976 a petition with the Board seeking an election in a unit consisting of the licensed tow-truck operators. On February 2 Jamaica Towing and the Union entered into an agreement for a consent election, scheduled for February 24, 1976.

In the meantime, shortly after receiving the Union's demand for recognition, Giorgianni in late January summoned his drivers to a meeting at the change of shifts and asked them who had signed or joined the Union. Receiving no response, he walked out. About a week later he held a second meeting with the drivers. On this occasion he assured them that their jobs were safe and that no one would be fired or released because of the "situation with the Union" but advised the drivers that the advent of a Union would change the congenial working relationship he had maintained with them, requiring all to abide by the terms of the Union contract. He commented that adherence to such a contract would necessitate working "strictly by the book," meaning, for example, that the drivers' wages would be docked if they arrived late for work, something Giorgianni had not done in the past. Giorgianni also stated that a collective bargaining agreement would "probably" provide for a 40-hour work week, without the opportunity for overtime which the drivers had been enjoying, requiring him to hire a third shift,[2] which would reduce the current drivers' work opportunities and preclude continuation of his practice of assigning each driver to his own truck, which the driver could take home after work.

---

1. Section 8(a) states:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of [Title 29];

. . . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

2. At this time the drivers were working 12 hours a day, six days a week.

At this second meeting, Giorgianni also inquired of the workers what the Union had promised them. The employees mentioned various issues, including medical benefits, work uniforms, wage increases, and increased vacation leave. Giorgianni responded that in view of the likelihood of an election he could not make any promises, but he said he would "consider and think about" these concerns.

About two weeks before the February 24 election Giorgianni met with a delegation of four of the drivers at the latter's request. These employees informed Giorgianni that the drivers had discussed matters among themselves and had concluded that their request for Union certification was a mistake. They told Giorgianni that if he would meet certain demands for guaranteed paid sick days, hospitalization benefits, a wage increase, and uniforms, they would vote against the Union. Giorgianni again responded that in view of the impending election he could make no promises or guarantee anything, since he would then be accused of attempting to bribe his employees, but that he would continue his policy of paying for sick days at his discretion, that he would look into the possibility of a hospitalization plan, that he thought the idea of providing uniforms was a good one, and that the employees had been due a wage review for some months, which he would conduct with each driver individually.

In addition to these meetings with all or several of the drivers, during the course of the election campaign Giorgianni on three occasions met in his office privately at his instance with a different individual driver on each occasion. Two of the meetings were held at the end of January and the third a few days before the election. On all three occasions Giorgianni expressed his loathing for a union and stated that if the workers were unwilling to resolve their dif-

ferences with him directly, he could use "muscle" if necessary to deal with the Union.

The Union lost the election by 6 votes to 2. The Union lodged unfair labor practice charges against Jamaica Towing, alleging that the foregoing conduct violated the Act and prevented a fair rerun of the election, and the General Counsel, through the Regional Director, issued a complaint embodying these charges. After conducting hearings with testimony on several days Administrative Law Judge Irwin H. Socoloff issued his decision on December 8, 1977, concluding that Giorgianni violated § 8(a)(1) when he interrogated the employees at the first meeting with all the drivers and when he interrogated and threatened at private meetings with each of three drivers to "use muscle." The ALJ determined, however, that Giorgianni's statements at the second meeting attended by all of the drivers and at the third meeting, attended by four of them, did not constitute offers, or promises to offer benefits to the drivers if they rejected the Union or threats to withdraw benefits if they accepted it.[3] Finally, the ALJ concluded that the instances of interrogation and the three "non-specific" threats to resort to "muscle" did not preclude the running of a fair second election. Accordingly, he issued a cease and desist order, with directions that Jamaica Towing post notices declaring that it would not interfere with the employees' exercise of their right to decide whether to join Local 917 or any other union.

The Union and the General Counsel took exception to the ALJ's failure to find that Giorgianni made unlawful promises or threats or that he unlawfully engaged in direct bargaining with the drivers at the two group meetings cleared by the ALJ. The exceptions also took issue with the ALJ's failure to issue a bargaining order

3. Following the election Giorgianni gave his drivers uniforms and individual wage increases. About seven months after the election, Giorgianni released three of his drivers. The ALJ found, and the Board sustained the finding, that these drivers were released because respondent's vehicle insurer refused to provide coverage for them and that all three declined Giorgianni's reasonable offers for continued employment in some capacity other than that of tow-truck operator. The ALJ and the Board found that none of this post-election conduct violated the Act.

certifying the Union as the drivers' exclusive bargaining representative without a second election. Respondent did not take exception to any of the ALJ's findings adverse to it, rendering these findings, which include a finding that the licensed tow-truck operators are an appropriate bargaining unit, conclusive for purposes of this proceeding. 29 U.S.C. § 160(e).

In a decision issued July 19, 1978 a three-member panel of the Board affirmed the decision of the ALJ insofar as it held that respondent's pre-election conduct violated § 8(a)(1) and that its post-election conduct was lawful. It reversed, however, insofar as the ALJ's decision had stated the Giorgianni's conduct at the second and third group meetings did not violate §§ 8(a)(1) and (a)(5). The Board also concluded that Giorgianni's conduct had so thoroughly and indelibly prejudiced the employees' right to determine whether to unionize that a fair rerun of the election was impossible. Accordingly, the Board issued a bargaining order, declaring the Union to be the drivers' exclusive bargaining representative as of February 1, 1976. This petition for enforcement followed.

## DISCUSSION

■ As we have noted, the findings of the ALJ adopted by the Board that Giorgianni's conduct at the first meeting with the group of drivers and his subsequent meetings with each of three individual drivers violated § 8(a)(1) of the Act are not contested. As to the additional findings of § 8(a) violations, although the Board's conclusions with respect to Giorgianni's conduct at the second and third meetings conflict with those of the ALJ—a fact we may consider upon review—we are nevertheless bound by the substantial evidence rule in our review. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Applying this standard we accept

the Board's conclusions even though we might have reached a different result as to some of them.

The ALJ and the Board do not differ in their findings as to what Giorgianni said and did at the second and third meetings; they simply drew differing inferences. One could, as did the ALJ, reasonably infer from the facts as found that Giorgianni's talk at the second group meeting, prefaced as it was with an assurance that the employees' jobs were safe, amounted to nothing more than a reasonable prediction based on everyday observation regarding the usual consequences of unionization or a vague speculation having no coercive effect, *see* § 8(c) of the Act, 29 U.S.C. § 158(c), *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–619, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and that his responses at the third meeting to employee-initiated efforts to bargain directly with him represented a tightrope-walking effort to avoid direct promises but at the same time not give the appearance of being wholly unsympathetic to the employees' demands. However, the conclusions to be reached turn more on expertise in the psychology of labor relations than on credibility of the witnesses. Accordingly, we defer to the Board's competence in this area and accept its conclusions.[4]

■ When it comes to the Board's decision to issue a bargaining order in lieu of a rerun of the election, however, we find the Board's explanation for the use of this remedy to be substantially deficient. Although the Board has broad discretion in determining the appropriate remedy for an employer's subversion of the election process, *NLRB v. Gissel Packing Co.*, supra, 395 U.S. at 614, 89 S.Ct. 1918; *NLRB v. International Metal Specialties, Inc.*, 433 F.2d 870, 872 (2d Cir. 1970), *cert. denied*, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971), we have barred the issuance of a bargaining order in

---

**4.** Respondent does not specifically contest the Board's finding that it violated § 8(a)(5) by dealing directly with the employees after a duty to bargain exclusively with the Union accrued. These rulings, which derive from the rulings that respondent violated § 8(a)(1), are evidently relevant only for purposes of dating the inception of respondent's duty to bargain should the Board issue a bargaining order or should the union win in a rerun election. See *Trading Port, Inc.*, 219 N.L.R.B. 298, 300–01 (1975).

the absence of express consideration of those factors which, in the Board's view, preclude reliance on the preferred remedy of a second election. *NLRB v. Scoler's Inc.,* 466 F.2d 1289, 1293 (2d Cir. 1972); *NLRB v. General Stencils, Inc.,* 438 F.2d 894, 902 (2d Cir. 1971); *Kenworth Trucks of Philadelphia, Inc. v. NLRB,* 580 F.2d 55, 59–61, *opinion modified upon rehearing,* 580 F.2d 61 (3rd Cir. 1978); *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1118–19 (7th Cir. 1973). The value of an explication by the Board of its reasoning is particularly great where, as here, the Board reverses the decision of the ALJ.[5] As we stated in *General Stencils, supra,* 438 F.2d at 902:

> ". . . the Board should explain in each case just what it considers to have precluded a fair election and why, and in what respects the case differs from others where it has reached an opposite conclusion."

No such explanation was furnished by the Board in the present case. Indeed, the Board's discussion of the appropriate remedy consists of a single summary assertion that

> "[r]espondent sought to undermine the Union and dissipate its majority while refusing to bargain, and thereby engaged in pernicious conduct which, by its nature, has long-lasting, if not permanent, effects on the employees' freedom of choice in selecting or rejecting a bargaining representative."

We recognize that we have not struck down any of the Board's findings, as was the case in *General Stencils,* which might in any event call for Board reconsideration of the remedy in light of modified findings. But we are dealing with a close case in which there are factors lending support to the ALJ's conclusion that the employer's conduct, though violative of the Act, would not have sufficient prejudicial effect to pre-

clude a fair rerun election. It is true that Giorgianni's conduct may have been calculated to dissipate support for the Union, he acted in his capacity as the head of the company, his statements were probably relayed to all members of the unit,[6] and the unit consisted of a small, closely knit group of eight relatively unsophisticated workers. However, there were no dismissals for pro-union activities, no threats to close down or curtail the company's operations if the Union should prevail, and no actual use of force or physical violence, which usually are the hallmarks in cases where bargaining orders issue.

 Moreover, several circumstances not addressed by the Board in its decision suggest that the prejudicial impact of the unlawful conduct may have been sufficiently dissipated to permit a fair rerun of the election. At least three of the drivers who signed cards and two of the drivers who received Giorgianni's "muscle" speech no longer work for Jamaica Towing. The record does not indicate what additional turnover or change in the size of the unit, if any, has occurred. The Board issued its decision about two and one-half years after the events in issue occurred. Another year passed while the Board's petition for enforcement was pending. Although the passage of time, standing alone, may not remove the need for a bargaining order—a contrary holding might lead an employer to drag out the proceedings—it may, when it is coupled with a substantial change in the composition of the work force, render a bargaining order obsolete and unnecessary.

 Lastly, in the absence of any reference by the Board to the specific guidelines it follows in deciding whether to issue a bargaining order, there is an inadequate safeguard against precipitous or arbitrary action by the Board. While the issuance of a bargaining order in this case is arguably

---

5. We need not here decide whether the Board can satisfy its obligation to explicate its decision by adopting that given by the ALJ, since that issue is obviously not presented here. See *Kenworth Trucks, supra,* 580 F.2d at 61–63.

6. It is not clear whether the three employees who met individually with Giorgianni reported to their comrade Giorgianni's remarks about his "muscle." It is not disputed that all of the drivers were present when Giorgianni advised them that approval of the Union would modify his relationship with them.

consistent with the Board's decisions upheld in *Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739 (10th Cir. 1976), and *Texaco, Inc. v. NLRB*, 436 F.2d 520 (7th Cir. 1971), it appears to be inconsistent with the Board's decisions in other cases where it found a bargaining order unjustified. *See, e.g.,* decisions cited in *General Stencils*, 438 F.2d at 903–04; *Gold Circle Department Stores*, 207 N.L.R.B. 1005 (1973); *May Department Stores Co.*, 211 N.L.R.B. 150 (1974). The seeming inconsistencies in the Board's case law give rise to the impression that it is making *ad hoc* decisions on a matter of considerable importance in the fair administration of the National Labor Relations Act. This impression can only be dispelled if the Board, before issuing or declining to issue a bargaining order, sets forth the relevant standards as they have evolved in its decisional law and describes the applicability of these standards to the facts of the case at hand.

While we do not propose that the Board, before issuing a bargaining order, must canvass its case law to demonstrate that issuance of such an order would be consistent with all prior decisions, it must be remembered that:

> "Bargaining orders are not immune from the great principle that like cases must receive like treatment. While the Board has wide discretion in framing remedies, the agency has a correlative duty to explain its imposition of a remedy in one case and its failure to do so in a seemingly similar—or even stronger—one on a basis reviewing courts can understand." *General Stencils, supra*, 438 F.2d at 904–05 (footnote omitted).

Accordingly, although we accept and affirm the Board's findings and are reluctant to protract this case further, we remand the case to the Board for further consideration of the appropriate remedy for the § 8(a) violations.